# Illinois Official Reports

## Appellate Court

---

### *People v. Thompson*, 2020 IL App (1st) 171265

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DEANDRE THOMPSON and CEDRYCK DAVIS, Defendants-Appellants. |
| District & No. | First District, Fourth Division<br>Nos. 1-17-1265, 1-17-1266 cons. |
| Filed<br>Rehearing denied | May 21, 2020<br>June 2, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-CR-7329; the Hon. Thomas J. Byrne, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Adrienne E. Sloan, of State Appellate Defender's Office, of Chicago, for appellants.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Brian A. Levitsky, and Adam C. Motz, Assistant State's Attorneys, of counsel), for the People. |

PRESIDING JUSTICE GORDON delivered the judgment of the
                        court, with opinion.
                        Justices Lampkin and Burke concurred in the judgment and opinion.


                                    **OPINION**

¶ 1        After a joint jury trial, defendants Cedryck Davis and Deandre Thompson were convicted
of the attempted murders of Shawn Harrington and his 15-year-old daughter Naja.[1] The
shooting occurred on January 30, 2014, at 7:45 a.m., as Harrington was driving his daughter
to school. The shooting left Harrington paralyzed from the waist down, while Naja was not
injured. Each defendant was sentenced to 59 years with the Illinois Department of Corrections
(IDOC).

¶ 2        On appeal, both defendants claim (1) that the State's evidence was insufficient to prove
them guilty beyond a reasonable doubt of being the shooters, (2) that the State failed to prove
that they had a specific intent to kill Naja, and (3) that the trial court erred in admitting other-
crimes evidence on the issue of identity. In addition, Thompson claims (4) that the trial court
erred in admitting the pretrial statement of a trial witness who denied making it and (5) that his
sentence was excessive in light of the fact that his criminal history was less extensive than his
codefendant's criminal history.

¶ 3        For the following reasons, we affirm.


¶ 4                                   BACKGROUND

¶ 5        Prior to trial, the trial court considered several motions. Among them was Davis's motion
to quash arrest and suppress the victims' lineup identifications of him on the ground that the
arresting officers lacked probable cause to arrest him prior to the lineups. The trial court denied
that motion, as well as defendants' joint motion for a severance. However, over the objection
of both defense attorneys, the trial court granted the State's motion to admit other-crimes
evidence that Davis and Thompson had shot at a man named Darren Dear two days before the
Harrington shooting. Ballistics evidence established that one of the bullets recovered from the
Dear shooting matched bullets recovered from the Harrington shooting. After hearing
argument, the trial court ruled that it would "let the other crimes evidence in for the purposes
of identity."

¶ 6        At trial, Harrington, age 41, testified that, on January 30, 2014, the day of the shooting, he
was a special education teacher and assistant basketball coach. At 7:45 a.m., he was on his way
to work and to drop off his oldest daughter, Naja, age 15, at her school. Taking the same route
that he took every morning, he came to a stop at a traffic light at an intersection. When he
stopped, he noticed a man standing on the corner, pointing in Harrington's direction. After the
man pointed, the first gunshot came through the back window. Harrington turned and observed
that, in addition to the man he had previously noticed, there was a second man standing a little

---

[1]Since father and daughter share the same last name, we will refer to the father as Harrington and
his daughter as Naja.

further off. His daughter was in the front passenger seat, and he pushed her down, in order to cover her with his body. He heard at least 10 shots.

¶ 7    Harrington identified Davis in court as the man who had pointed at him. Harrington testified that he had also identified Davis on April 8, 2014, during a five-person lineup at a police station. A photo of the lineup was admitted into evidence, without objection, and published to the jury. The photo showed that all five men in the lineup were African American, with closely cropped hair and sparse facial hair.

¶ 8    When Harrington first observed Davis, Davis was 20 to 25 feet away. The morning daylight provided good lighting, and there were no obstructions between himself and Davis to block Harrington's line of sight. A video of the shooting, which Harrington previously viewed, was admitted into evidence, without objection, and published to the jury during his testimony. Harrington testified that the video truly and accurately depicted the shooting as he remembered it, and he described the video, without objection, as follows: "It showed me proceeding south *** and people—two people come up the street, and it showed my car. Once I get to a stop, then gunshots started coming and it just seemed like from everywhere. *** It showed two people on the tape actually shooting."[2] As a result of the shooting, Harrington is permanently paralyzed.

¶ 9    On cross examination by Thompson's counsel, Harrington testified that, after the shooting, he was transported to a hospital where he spoke to police officers. He did not recall telling them that he had observed and could identify the faces of both shooters, but it is possible he said that. Prior to the shooting, Harrington looked at the first man, who was standing on the corner, to determine why the man was pointing; then the first gunshot went through the back window. Harrington turned, looked over his shoulder and through the back passenger window, and that is when he first observed the second man, who Harrington was not able to identify from the photos the police showed him. The second man, who was later identified by Naja as Thompson, stood to the side of Harrington's vehicle, closer than "half a car's length." Harrington viewed only one lineup, which was the one from which he selected Davis.

¶ 10    On cross examination by Davis's counsel, Harrington testified that, when Davis pointed at Harrington prior to the shooting, Harrington did not observe a gun in Davis's hands. Davis was pointing with his finger. After Harrington pulled his daughter down and tried to shield her with his body, Harrington did not know from which direction the gunfire came. The only shot that he observed was the first shot, which entered from behind the vehicle. He did not recall telling the police at the hospital that he heard between five and seven shots. He did tell the police that that the shooters were two black males, wearing hoodies, with their hoods up, and that Davis's hood was "dark-colored."

¶ 11    On redirect examination, Harrington testified that he was focused on Davis for 5 to 10 seconds and that he focused on Davis because Davis was gesturing toward him. During the incident, Davis wore a black coat or vest, and Davis's sleeves were a different and lighter color than his vest. Harrington did not recall providing police with a clothing description of the second man.

¶ 12    Naja testified that she was presently 18 years old and in college. On January 30, 2014, at 7:45 a.m., she was in high school, and her dad was driving her to school when he was shot.

_____

[2]This court was unable to view the video. The DVD film depicted blotches and boxes of color and may have been corrupted.

- 3 -

Their vehicle, which her father was driving, was slowing down as it approached a traffic light when, from the front passenger seat, she observed two young black men on the sidewalk. One stood near the intersection, and one stood directly across from her passenger side. The man near the intersection wore a black vest and grey sleeves, which looked like a hoodie under a vest. The man standing directly across from her wore an orange hoodie. Although their hoods were up, Naja had no trouble observing their faces.

¶ 13    Naja testified that the man in the orange hoodie was 15 feet away from her, while the man with the grey sleeves was 20 to 25 feet away. As the vehicle slowed down, she observed each man for a few seconds, and then returned to looking straight ahead. Then she heard bullets hitting the passenger door behind her. During the shooting, she heard a total of 10 to 15 shots. Her father pulled her down and covered her with his body, and she was not hit or injured.

¶ 14    Naja did not observe any guns in the hands of the two men, but she was not looking at them when the shots were fired. On February 4, 2014, while her father was still in the hospital, she went to a police station to view a five-person lineup. During this lineup, she identified Thompson as the man in the orange hoodie. The lineup photos, which were admitted into evidence, showed that all five men in the lineup were African American and were wearing jeans and hoodies with their hoods up.

¶ 15    Two months later, on April 8, 2014, Naja returned to the police station with her father to again view a five-person lineup. When she actually viewed the lineup, her father was not present. During this second lineup, she identified Davis as the man with the black vest and grey sleeves who had stood near the intersection. Naja also identified both Davis and Thompson in court.

¶ 16    On cross examination by Thompson's counsel, Naja testified that, prior to the shooting, she observed Thompson for five seconds, and during a portion of this time, Thompson had his face turned away from her. Thompson was 5 feet and 9 or 10 inches tall. Naja recalled that, prior to viewing the Thompson lineup, the detective told her that "the person may or may not be in the line-up."

¶ 17    On cross examination by Davis's counsel, Naja testified that, prior to the shooting, she had less time to observe Davis than she did Thompson and that Davis was further away from her than Thompson was. When asked if Davis was in "a dark hoodie," she clarified that it was "a gray hoodie." Naja did not observe Davis either with a weapon in his hands or pointing at her. After the shooting, Naja described the shooters to the police as two African American males, who were approximately 17 years old.

¶ 18    Assistant State's Attorney (ASA) Anthony Kenney testified that, on February 3, 2014, he interviewed Charles Molette regarding the shooting of Daren Dear on January 28, 2014, which was two days before the shooting in the case at bar. After speaking with Molette, Kenney memorialized Molette's statement by typing it on his laptop. Molette's statement was admitted into evidence and published to the jury.

¶ 19    In the typed statement, Molette stated that he was 17 years old. On January 28, 2014, at 7:55 a.m., he observed a burgundy van with a driver and one passenger in the front passenger seat. After the van stopped, the driver, who Molette recognized as Thompson, ran to the back of the van and fired a gun at Darren Dear. The passenger of the van reached his hand out of the vehicle and also fired at Dear, and Molette recognized the passenger as Davis. Thompson then ran back to the driver's seat of the van and drove away.

¶ 20    Molette testified that he was 20 years old and presently in custody due to a drug conviction. At trial, Molette denied the entire statement. He denied being in the vicinity of the Dear shooting at 7:55 a.m. on January 28, 2014, or knowing Dear, or being able to recognize either defendant in court, or meeting with Detective Hector Matias or ASA Kenney. Molette acknowledged that his name appeared at the bottom of each page of the statement but responded, "That ain't my handwriting." Molette acknowledged that one of the photos attached to the statement was a photo of himself. When asked if the photo was taken at a police station on February 3, 2014, he responded that he did not recall going to the police station.

¶ 21    On cross examination, Molette testified that he does not print his signature and that his name, as it appeared on the bottom of each page of the statement, was printed. Molette agreed that one of the photos was of him in a police station and that "people" had tried to talk to him and tried to secure his signature on the statement, but he refused to sign it. While in the police station, Molette insisted that he did not know anything about a shooting. After Molette's testimony, a sidebar was held off the record. On the record, both defense attorneys objected when Molette's statement was admitted into evidence, indicating that the objection was for reasons already stated.

¶ 22    The State called several witnesses to establish that a bullet recovered from the Dear shooting matched bullets recovered from the Harrington shooting. Officer Abraham Lara testified that he recovered a fired bullet from Harrington's clothing when Harrington was in the ambulance immediately after the shooting and a second fired bullet from Harrington's clothing when Harrington was at the hospital. Officer Alex Aranowski, an evidence technician, testified that he recovered three fired bullets from the inside of Harrington's vehicle, as well as six .40-caliber shell casings, one .380 casing, and one .380 live round from the sidewalk at the scene of the Harrington shooting. With respect to the Dear shooting, Detective Edward McGovern testified that he received a fired bullet from hospital medical personnel. Mark Pomerance, a forensic scientist with the Illinois State Police, was accepted by the court as an expert in firearms identification without objection from either defense counsel. Pomerance testified that, based on his examinations and his expertise, "the four fired bullets from the Harrington shooting and the one fired bullet from the Dear shooting were fired from the same unknown firearm" and that the six .40-caliber shell casings recovered in the Harrington case were all fired from the same firearm. Pomerance explained that, without a firearm to test, he could not compare the fired bullets with the shell casings. Also, a .380-caliber bullet and a .40-caliber bullet could not be fired from the same gun.

¶ 23    Officer Steven Jaglarski testified that, on January 30, 2014, he encountered Molette "on the street" and that Molette indicated that he had information regarding the Harrington shooting. Officer Jaglarski knew Molette from prior contacts, and Molette agreed to voluntarily accompany Officer Jaglarski to the police station to talk to detectives.

¶ 24    Detective Matias testified that, at the police station on January 30, 2014, Molette told him that Davis and Thompson had shot at Dear on January 28, 2014. Molette also provided information about the Harrington shooting. After the January 30 interview, officers drove Molette home.

¶ 25    On cross examination by Thompson's counsel, Detective Matias testified that, after the ballistics report found a match between the bullets of the Harrington and Dear shootings, Molette returned to the police station on February 3, 2014, to provide the statement. On February 4, 2014, when Naja viewed the lineup with Thompson, she was "[v]ery upset."

Detective Matias was the only detective in the room with Naja when she viewed the Thompson lineup. A witness to the Harrington shooting informed the police that one "shooter" was "wearing what he believed was a Bears jacket," and Naja informed them that one of the shooters was wearing orange. As a result, a man "who was known to wear a Bears jacket" in the area was brought to the police station for investigation. This man, Daniel Malik, was released on January 30, 2014.

¶ 26    On cross examination by Davis's counsel, Matias testified that, between the time of the shooting in January and the lineup on April 8, 2014, no one attempted to have Harrington make "any type of identification" of Davis. Matias was in the room with Harrington and Naja when they each viewed the Davis lineup.

¶ 27    Detective Mark Leavitt testified that he was present when officers from the police tech lab recovered a video of the shooting from a nearby security camera and that he submitted the request to the Illinois State Police to compare the bullets from the Dear and Harrington shootings that occurred two blocks from each other. He was also present on February 3, 2014, when Molette provided and signed his statement. After Molette's statement was taken, investigative alerts were issued regarding both Davis and Thompson. Thompson was arrested on February 4, 2014, and Davis was arrested on April 8, 2014.

¶ 28    On cross examination by Thompson's counsel, Detective Leavitt testified that the video of the shooting depicted one shooter standing in front of the victim's vehicle and another standing on the sidewalk near the side or rear of the vehicle.

¶ 29    After listening to counsel's arguments and the trial court's instructions, the jury deliberated and convicted Davis and Thompson of the attempted first degree murders of Harrington and Naja, and found that both men personally discharged firearms during the offenses. After considering factors in aggravation and mitigation, the trial court sentenced each defendant to 59 years with IDOC, which was 7 years above the statutory minimum and 41 years below the possible maximum sentence. Notices of appeal were timely filed, and this appeal followed.

¶ 30                                ANALYSIS
¶ 31                          I. Insufficient Evidence
¶ 32    Defendants' first claim is that the State presented insufficient evidence to convict them, and their second claim is that the State presented insufficient evidence of intent with respect to Naja. Both claims are claims of insufficient evidence. However, since the parties separated them into two claims, we will analyze first whether the State presented sufficient evidence that defendants were the shooters and analyze second whether the State presented sufficient evidence specifically on the element of intent with respect to Naja.

¶ 33    "Where a defendant challenges the sufficiency of the evidence, the standard of review is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. McGee*, 398 Ill. App. 3d 789, 793 (2010); *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004). " '[T]he critical inquiry *** must be *** to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.' " *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318 (1979)).

¶ 34    "[A] reviewing court will not reverse a criminal conviction unless the evidence is so unreasonable, improbable or unsatisfactory as to create a reasonable doubt of the defendant's

guilt." *People v. Rowell*, 229 Ill. 2d 82, 98 (2008); *McGee*, 398 Ill. App. 3d at 793. A reviewing court will not retry the defendant or substitute its judgment for that of the trier of fact. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009).

¶ 35    A person commits first degree murder if, in performing the acts that cause a death, "he or she *** intends to kill or do great bodily harm to the victim or another individual, [or] knows that the acts will cause the victim's or another's death, or knows the acts create a strong probability of death or great bodily harm to the victim or another." *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 59; 720 ILCS 5/9-1(a)(1), (a)(2) (West 2014). "A person commits attempted murder when, with intent to commit murder, he or she takes any substantial step towards committing murder." *Joiner,* 2018 IL App (1st) 150343, ¶ 59; 720 ILCS 5/8-4(a), 9-1 (West 2014).

¶ 36                                            A. Davis

¶ 37    The State's evidence at trial that Davis was the shooter included not one, but two eyewitness identifications. Davis was identified, separately, by both Naja and Harrington in court and at a lineup. In addition, Molette stated in his statement that he observed Davis participating in another shooting only two days earlier and only two blocks away—close in both time and physical proximity. Molette's statement was corroborated, in part, by the fact that a fired bullet from the earlier Dear shooting matched four of the fired bullets from the Harrington shooting, thereby establishing that the same gun was used in both shootings.

¶ 38    In response, Davis argues that the State's evidence was insufficient because (1) the eyewitnesses' original viewing was poor, (2) the line-up procedure was suggestive where Davis was the only person in a dark hoodie, (3) Molette denied his statement at trial, and (4) the State's evidence suggested that Davis was firing a .380-caliber gun and not the .40-caliber gun that was used in the prior Dear shooting.

¶ 39    However, the sufficiency issues were raised by Davis's counsel during trial and argued to the jury who simply did not find them persuasive. See *Joiner*, 2018 IL App (1st) 150343, ¶ 63 ("[d]efendant's argument regarding the sufficiency of the evidence fails because the weaknesses in the evidence that defendant cites on appeal were all presented to, considered, and rejected" by the factfinder). Nonetheless, we address each argument raised by him on appeal.

¶ 40                                      1. Original Viewing

¶ 41    Davis's first argument concerns Harrington and Naja's opportunity to view the offenders.

¶ 42    Davis is correct that identification evidence that is vague or doubtful is insufficient to support a conviction. *Joiner,* 2018 IL App (1st) 150343, ¶ 47 (citing *People v. Slim*, 127 Ill. 2d 302, 307 (1989)). However, a single witness's identification of the accused is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification. *Joiner*, 2018 IL App (1st) 150343, ¶ 47 (citing *Slim*, 127 Ill. 2d at 307). In assessing identification testimony, we consider the five factors set forth in *Neil v. Biggers*, 409 U.S. 188 (1972): (1) the witness's opportunity to view the offender during the offense, (2) the witness's degree of attention at the time of the offense, (3) the accuracy of the witness's prior description of the offender, (4) the witness's level of certainty at the identification, and

(5) the length of time between the offense and the identification. *Joiner*, 2018 IL App (1st) 150343, ¶ 47 (citing *Biggers*, 409 U.S. at 199-200).

¶ 43    Davis argues, first, that eyewitness testimony is fallible, particularly where the observer is under sudden stress, as both Naja and Harrington were *during* the shooting. The problem with this argument is that both Naja and Harrington observed Davis *before* the shooting even started. Naja testified that she observed Davis for a few seconds and then returned to looking straight ahead before the shooting started. Harrington testified that his attention was focused on Davis because Davis was pointing at him—again, before the shooting started.

¶ 44    Davis argues that the shooters wore hoods, thereby obscuring their faces to the same degree that disguises or masks would. However, Harrington testified that he had a clear, unobstructed view, and Naja testified specifically that she had a clear, unobstructed view of Davis's face.

¶ 45    Davis argues next that the brief duration of the initial viewing suggests room for error. The brevity of a witness's opportunity to view, by itself, will not discredit an identification, although it is a factor that a trier of fact may consider when weighing the testimony. *People v. Petermon*, 2014 IL App (1st) 113536, ¶ 32 (identification was found to be reliable, although "the entire incident took less than a minute"). Harrington testified that his attention was focused on Davis for 5 to 10 seconds because Davis was gesturing at him, while Naja testified that she observed Davis for less than 5 seconds.

¶ 46    Although the duration of the initial viewing was brief, consideration of all the *Biggers* factors, as well as the other evidence, does not persuade us that the evidence was so insufficient that no reasonable person could have found Davis guilty beyond a reasonable doubt. With respect to the first *Biggers* factor, both Harrington and Naja testified that they had a clear, unobstructed view of Davis in broad daylight, between 20 to 25 feet away, before the stress of the shooting began, although for a short time. With respect to the second *Biggers* factor, Harrington's attention was focused on Davis because Davis was pointing at him and Naja also observed Davis, and just Davis, for a few seconds. With respect to the third *Biggers* factor, Naja and Harrington's initial description was mostly about the shooters' clothing but there was no evidence that it was inaccurate. With respect to the fourth *Biggers* factor, there has been no suggestion that the witnesses' certainty has ever wavered. Lastly, the lineup identification occurred on April 8, 2014, a little over two months after the January 30, 2014, offense. This court has affirmed identifications with a greater time lapse. *E.g.*, *People v. Malone*, 2012 IL App (1st) 110517, ¶ 36 (rejecting defendant's argument that a time lapse of one year and four months was " 'a seriously negative factor' "); see also *People v. Green*, 2017 IL App (1st) 152513, ¶ 113 (finding an identification with a three-month time lapse reliable). Thus, a consideration of the five *Biggers* factors does not persuade us that no rational juror could accept these identifications.

¶ 47    In addition, there were two independent identifications, with each one thereby bolstering the other, and corroboration of both identifications through Molette's statement and the ballistics evidence, which we discuss further below. Thus, a consideration of this argument does not lead us to find the State's evidence insufficient.

¶ 48                          2. Lineup Procedure

¶ 49    Davis argues that the lineup procedure was suggestive where he was the only participant wearing a dark hoodie.

¶ 50    Participants in a lineup are not required to be physically identical. *Joiner*, 2018 IL App (1st) 150343, ¶ 44. Thus, for example, this court has not found a lineup suggestive where the defendant was the only person in the lineup with braided hair. *Joiner*, 2018 IL App (1st) 150343, ¶ 44. In the case at bar, as in *Joiner*, "[t]he participants in the lineup shared many similar features." *Joiner*, 2018 IL App (1st) 150343, ¶ 44.

¶ 51    A photo of the lineup, which was admitted into evidence without objection, showed that all five men in the lineup were African American, that all five had closely cropped hair and that all five had some, but sparse, facial hair. One man was almost exactly the same height as Davis, two men were somewhat shorter, and the fifth man was noticeably taller. Thus, the bodily characteristics of the men in the lineup did not make Davis distinctive.

¶ 52    Davis claims that the problem was with his clothing in the lineup. Three of the men wore blue jeans, including Davis. The man to Davis's right wore a black and white Nike sweatshirt, Davis wore a black Nike sweatshirt with a hood, and the man to Davis's left wore a navy blue sweatshirt with an orange football. Thus, three of the five men wore dark, athletic sweatshirts.

¶ 53    However, Davis argues that he was the only one wearing a black hoodie and that set him apart, since the shooter on the corner also wore a dark hoodie. However, Naja testified that the hoodie of the shooter on the corner was grey, not black, and that only his vest was black. Similarly, Harrington testified that the shooter's sleeves were a different and lighter color and that he could have been wearing a vest. Particularly in light of the fact that no one in the lineup wore a grey hoodie or even a grey sweatshirt, this factor did not render the lineup unduly suggestive.

¶ 54                            3. Molette's Pretrial Statement

¶ 55    Davis argues that Molette's pretrial statement was not reliable in light of the fact that he denied making it at trial.

¶ 56    Credibility is generally an issue for the jury, not the appeals court. *People v. Donahue*, 2014 IL App (1st) 120163, ¶ 82. A jury's credibility determinations are entitled to great deference and are rarely disturbed on appeal. *Donahue*, 2014 IL App (1st) 120163, ¶ 82. The reason for this deference is that the jurors were in a far better position to determine and weigh credibility since they viewed and heard the witnesses first-hand, whereas a reviewing court has only a cold, inert transcript on which to rely. *Donahue*, 2014 IL App (1st) 120163, ¶ 82; see also *People v. Patterson*, 2014 IL 115102, ¶ 43 ("Due to inherent limitations in reviewing a cold transcript, we must give the trial court's credibility findings considerable deference."). The issue is whether viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the evidence credible and found defendant guilty beyond a reasonable doubt. *Donahue*, 2014 IL App (1st) 120163, ¶ 83.

¶ 57    In the case at bar, the jury listened to Molette's testimony at trial, where he testified on direct examination that he did not recall even going to the police station and then, on cross examination, he readily acknowledged that a photo attached to his statement was a photo of him at the police station. The jury had an opportunity to weigh his denial against the testimony of an ASA and two detectives who testified to witnessing Molette make his statement and sign every page of it. Viewing the evidence in the light most favorable to the State, as we are required to do, we find that a rational juror could certainly have found Molette's trial testimony less credible than his pretrial statement. See *Donahue*, 2014 IL App (1st) 120163, ¶ 83.

¶ 58                                    4. The .40-Caliber Gun

¶ 59        Davis argues that the State's evidence showed that the shooter near the intersection fired a
.380-caliber gun, whereas the shooter who stood alongside the Harrington vehicle fired a .40-
caliber gun; that only the .40-caliber gun was connected to the Dear shooting; that Davis was
identified as the shooter near the corner; and that, as a result, no physical evidence connected
Davis to the Dear shooting.

¶ 60        However, the ballistics evidence is not as conclusive as Davis argues regarding which
shooter fired which gun. Officer Aranowski, the evidence technician, testified that on January
30, 2014, at 8:11 a.m., he went to the scene of the shooting where he recovered six .40-caliber
fired cartridge cases from the sidewalk, which he marked with yellow crime-scene markers,
Nos. 4 through 9, and one .380-caliber live round, marked with crime scene marker No. 10.
The markers numbered 4 through 10 went in a zigzag line down the sidewalk, with No. 4 being
closest to the corner and No. 10 being the furthest away from the corner. Thus, the .380 live
round was further away from the corner, and the six .40-caliber cases were actually closer to
the corner.

¶ 61        Later in the day, at 1:30 p.m., Officer Aranowski returned to the scene at the request of
other officers because they had discovered additional firearm evidence, namely, one .380-
caliber fired cartridge case on the sidewalk, located right at the corner, thereby casting some
uncertainty on its original location.

¶ 62        As a result, the State's ballistics evidence does not conclusively establish which shooter
fired which gun, as Davis argues on appeal.

¶ 63        In sum, for all the reasons discussed above, we do not find persuasive Davis's arguments
and find that the State's evidence was sufficient for a rational juror to find beyond a reasonable
doubt that Davis was one of the two shooters.


¶ 64                                         B. Thompson

¶ 65        The State's evidence at trial that Thompson was the shooter was similar to the State's
evidence regarding Davis, but differed in that only one eyewitness identified Thompson, rather
than two. Thompson was identified solely by Naja, in court and at a lineup. However, unlike
Davis, Thompson makes no allegations that his lineup was suggestive, and a single witness's
identification of the accused is sufficient to sustain a conviction if the witness viewed the
accused under circumstances permitting a positive identification. *Joiner*, 2018 IL App (1st)
150343, ¶ 47 (citing *Slim*, 127 Ill. 2d at 307). In addition to Naja's identification, Molette stated
in his statement that he observed Thompson also participating in the Dear shooting, which
occurred only two days earlier and only two blocks away. As we noted above, Molette's
statement was corroborated, in part, by the fact that a fired bullet from the earlier Dear shooting
matched four of the fired bullets from the Harrington shooting, thereby establishing that the
same gun was used in both shootings.

¶ 66        In response, Thompson argues that the State's evidence was insufficient because (1) Naja's
original viewing was poor and (2) Molette denied his statement at trial. Like Davis, Thompson
argues that the duration of Naja's view was brief and obscured by a hood. For the reasons
already explained above, we do not find these arguments persuasive. As with Davis,
Thompson's counsel argued the insufficiency of the evidence to jurors who were not
persuaded. See *Joiner*, 2018 IL App (1st) 150343, ¶ 63 ("[d]efendant's argument regarding the

sufficiency of the evidence fails because the weaknesses in the evidence that defendant cites on appeal were all presented to, considered, and rejected" by the factfinder).

¶ 67    Applying the five *Biggers* factors to Naja's view of just Thompson does not lead us to find her identification unreliable. See *Joiner*, 2018 IL App (1st) 150343, ¶ 47 (citing *Biggers*, 409 U.S. at 199-200); *supra* ¶ 46 (listing the five *Biggers* factors). With respect to the first *Biggers* factor, Naja testified that she had a clear, unobstructed view of Thompson in broad daylight, before the stress of the shooting began. Although Naja testified that Thompson's head was turned for a portion of her brief five-second viewing, her view of Thompson was even better than her view of Davis. Unlike Davis, who was close to the intersection and 20 to 25 feet away from Naja, Thompson stood directly across from her passenger side, only 15 feet away. With respect to the second *Biggers* factor, Naja observed Thompson, and just Thompson, for a few seconds. With respect to the third *Biggers* factor, although Naja's initial description was mostly about Thompson's clothing, there was no suggestion that her initial description was inaccurate. With respect to the fourth *Biggers* factor, there has been no suggestion that her certainty about her identification of Thompson has ever wavered, either initially or on the witness stand. Lastly, the Thompson lineup occurred on February 4, 2014, a mere five days after the shooting, and Thompson does not claim on appeal that the lineup procedure was suggestive. See, *e.g.*, *Malone*, 2012 IL App (1st) 110517, ¶ 36 (rejecting defendant's argument that a time lapse of one year and four months was " 'a seriously negative factor' "). Thus, we cannot find that Naja's view of Thompson was so unreliable that a rational juror could not accept it, particularly in light of the additional evidence.

¶ 68    As discussed above, Davis argued that the ballistics evidence implied that one individual was involved in both shootings and that this individual was not him based on the placement of the .40-caliber evidence versus the .380-caliber evidence. We discussed this argument above and did not find it persuasive. In contrast, Thompson argues that the use of a single gun in both shootings does not establish the identity of either shooter and that it is possible for one gun to have been used in two shootings by a single unknown person or by two different people.

¶ 69    However, this argument overlooks the fact that the shooters in the prior Dear shooting were not unknown and were identified by Molette in his pretrial statement. As we already discussed above, the credibility issues raised by Molette's denial at trial were issues properly left to the jury to decide.

¶ 70    For all the reasons discussed in both this section and in the prior section regarding Davis, we find that the State's evidence was sufficient such that a rational juror could have found that Thompson was one of the shooters beyond a reasonable doubt. See *McGee*, 398 Ill. App. 3d at 793.

¶ 71                                    II. Specific Intent

¶ 72    Both defendants argue on appeal that the State's evidence was insufficient to prove that they had a specific intent to kill Naja. The sections in their respective briefs that raise this issue are almost word-for-word identical, so we address this issue with respect to both defendants in one section below.

¶ 73    Defendants argue that the State's evidence showed, at most, that they committed the offense of aggravated discharge of a firearm, in that they discharged "a firearm in the direction of another person or in the direction of a vehicle" they knew or "reasonably should [have]

know[n] to be occupied by a person." 720 ILCS 5/24-1.2(a)(2) (West 2014). Defendants argue that the State failed to show that they knew Naja was in the vehicle or a motive to shoot her.

¶ 74   Defendants contend that their arguments raise legal challenges to the prosecution's evidence and, thus, review is *de novo*. In support, defendants cite *People v. Smith*, 191 Ill. 2d 408, 411 (2000), which found that the issue of how to define the phrase "otherwise armed" in the armed violence statute was a legal question to be reviewed *de novo*. By contrast, defendants' argument is, in essence, an insufficient evidence claim, in that the State presented insufficient evidence to show their intent to kill Naja. See *People v. Teague*, 2013 IL App (1st) 110349, ¶¶ 22-23 (whether a defendant had the intent to kill required for attempted murder was an issue of the sufficiency of the evidence). However, under either standard, our finding would be the same.

¶ 75   "To prove a defendant guilty of attempted murder, the State must prove: (1) that defendant performed an act that constituted a substantial step toward committing murder; and (2) that he had the criminal intent to kill the victim." *Teague*, 2013 IL App (1st) 110349, ¶ 22; *People v. Green*, 339 Ill. App. 3d 443, 451 (2003). Since intent to kill is usually difficult to establish by direct evidence, it is usually inferred from the surrounding circumstances. *E.g.*, *Teague*, 2013 IL App (1st) 110349, ¶ 24 (citing a list of cases in support). These surrounding circumstances may include (1) the character of the assault, (2) the use of a deadly weapon, and (3) the nature and extent of the victim's injuries. *E.g.*, *Teague*, 2013 IL App (1st) 110349, ¶ 24 (citing a list of cases in support). In the case at bar, the character of the assault was a hailstorm of gunfire from two shooters, involving 10 shots from two deadly weapons. Although Naja was not injured, her body was physically shielded by the body of her father, who became a paraplegic as a result. While none of the shots fired by defendants actually struck Naja, frustrated marksmanship is not a defense to attempted murder. See *People v. Johnson*, 331 Ill. App. 3d 239, 251 (2002) ("While none of the shots fired by defendant actually struck [the victim], poor marksmanship is not a defense to attempted first degree murder.").

¶ 76   " ' "The very fact of firing a gun at a person supports the conclusion that the person doing so acted with an intent to kill." ' " *Teague*, 2013 IL App (1st) 110349, ¶ 26 (quoting *People v. Ephraim*, 323 Ill. App. 3d 1097, 1110 (2001), quoting *People v. Thorns*, 62 Ill. App. 3d 1028, 1031 (1978)); see also *People v. Garcia*, 407 Ill. App. 3d 195, 201-02 (2011) (a fact finder could reasonably infer an intent to kill "from the act of firing two bullets in the direction of an occupied car and a crowded street"); *Green*, 339 Ill. App. 3d at 451-52 (a jury could reasonable infer an intent to kill from evidence that the defendant fired a pistol four to five times in the direction of officers seated in a vehicle, even though defendant missed them at close range); *People v. Bailey*, 265 Ill. App. 3d 262, 273 (1994) (the defendant's "conduct in shooting down a breezeway in which several people were running is sufficient evidence to prove a specific intent to kill").

¶ 77   As noted, defendants argue that the State failed to prove that they had a motive to kill Naja or that they even knew that she was in the vehicle. First, the State is not required to prove motive. *People v. Melecio*, 2017 IL App (1st) 141434, ¶ 81 ("the State is under no obligation to prove motive"); *People v. Anderson*, 2017 IL App (1st) 122640, ¶ 55 ("The State is not required to prove motive in order to convict the defendant of first degree murder."); *Donahue*, 2014 IL App (1st) 120163, ¶ 123 ("the State has no obligation to prove a motive during a murder prosecution"); *People v. Smith*, 141 Ill. 2d 40, 56 (1990) ("It has long been recognized

by this court that motive is not an essential element of the crime of murder, and the State has no obligation to prove motive in order to sustain a conviction of murder.").

¶ 78 Second, from the fact that Naja viewed the shooters standing outside, the jury could have drawn the reasonable inference that they also viewed her—with their attention focused on that particular vehicle, standing 15 to 25 feet away, in broad daylight. The State's evidence established that the Harringtons took the same route every morning. The shooters were apparently waiting for them, with one shooter pointing out the arrival of their vehicle at the anticipated location.

¶ 79 Finally, defendants argue that Harrington was the intended victim and that this court should not apply the doctrine of transferred intent to cover the attempt on Naja, who was both an uninjured and unintended victim. *C.f. Ephraim*, 323 Ill. App. 3d at 1108 (the doctrine of transferred intent has been applied to "attempted murder cases where an unintended victim is injured"); see also *People v. Hensley*, 2014 IL App (1st) 120802, ¶ 83 (the doctrine of transferred intent applies when an unintended victim is injured); *People v. Valentin*, 347 Ill. App. 3d 946, 953 (2004) (the doctrine of transferred intent "applies when a third person is injured as a result of a defendant's assault upon another person"). Defendant argues that the Illinois Supreme Court and this court have been silent about whether the doctrine of transferred intent applies to uninjured, unintended victims and that we should not find that it does.

¶ 80 However, in the case at bar, the State's evidence was sufficient for a rational juror to find that Naja was an intended victim, where she and her father took the same route every morning, the shooters were apparently waiting at that location to ambush them, one of the shooters pointed out the apparently anticipated Harrington vehicle, there was not just one or two shots but a barrage of gunfire toward the vehicle that she occupied, Naja had no difficulty observing the shooters in broad daylight and from 15 to 25 feet away, and the jurors could reasonably infer that the shooters' line of sight to her was similarly unobstructed.

¶ 81 For the foregoing reasons, we find that a rational jury could have found beyond a reasonable doubt that the shooters had a specific intent to kill Naja.

¶ 82                                    III. Other-Crimes Evidence

¶ 83 Both defendants claim that the trial court erred by admitting the other-crimes evidence of the Dear shooting, arguing that its probative value was substantially outweighed by its unfair prejudice. For the following reasons, we do not find this argument persuasive.

¶ 84 The admission of evidence is within the sound discretion of a trial court, and a reviewing court will not reverse the trial court absent an abuse of that discretion. *People v. McNeal*, 2019 IL App (1st) 180015, ¶ 28; *People v. Ciborowski*, 2016 IL App (1st) 143352, ¶ 88. An abuse of discretion occurs when the trial court's decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the position adopted by the trial court. *McNeal*, 2019 IL App (1st) 180015, ¶ 28; *Ciborowski*, 2016 IL App (1st) 143352, ¶ 88. This standard applies to a trial court's decision to admit other-crimes evidence. *People v. Donoho*, 204 Ill. 2d 159, 182 (2003) ("We will not reverse the trial court's decision to admit other-crimes evidence unless we find that the court abused its discretion.").

¶ 85 "All relevant evidence is admissible, except as otherwise provided by law." Ill. R. Evid. 402 (eff. Jan. 1, 2011). " 'Relevant evidence' means evidence having any tendency to make

- 13 -

the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011).

¶ 86    Evidence of other crimes is generally not admissible if the purpose of its admission is to prove "the character of a person in order to show action in conformity therewith" or propensity. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Evidence of propensity is inadmissible, not because it is irrelevant, but because it has " 'too much' probative value" with jurors. *Donoho*, 204 Ill. 2d at 170 (quoting *People v. Manning*, 182 Ill. 2d 193, 213 (1998)). The fear is that a jury will convict a defendant because he or she appears to be a bad person, rather than evaluating his or her guilt or innocence solely on the basis of the charged crime. *Donoho*, 204 Ill. 2d at 170. Nonetheless, other-crimes evidence may still be admitted for other purposes, such as to prove identity. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Identity is the purpose for which the trial court admitted the other-crimes evidence in the case at bar.

¶ 87    Even if relevant and offered for a legitimate purpose, other-crimes evidence may still "be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Ill. R. Evid. 403 (eff. Jan. 1, 2011); *Donoho*, 204 Ill. 2d at 170 (even if other-crimes evidence tends to prove identity, "the court still can exclude it if the prejudicial effect *** substantially outweighs its probative value").

¶ 88    Defendants argue that (1) Molette's statement was not probative because he denied it at trial, and his denial at trial made his pretrial statement unreliable, and (2) any probative value the statement had was substantially outweighed by the unfair prejudice stemming from the fact that the statement informed the jury that defendants had been involved in another shooting just two days earlier.

¶ 89    For the reasons that we already discussed above in relation to the sufficiency of the evidence, we find that Molette's statement was sufficiently reliable and, hence, sufficiently probative for it to be submitted to the jurors who then had the ultimate responsibility for deciding its credibility and how much weight to accord it. The jury had the opportunity to listen to Molette's denials, first-hand. On direct examination by the State, he denied recalling even going to the police station, but then, on cross examination by the defense, he readily admitted that a photo was a photo of him at the police station. The jury could weigh his denials against the testimony of not one, not two, but three law enforcement personnel, who personally witnessed Molette making his statement and signing every page of it. We cannot say that the trial court abused its discretion in finding Molette's statement sufficiently reliable and probative to go to the jury.

¶ 90    Some of the reasons that make the statement prejudicial, according to defendants, are also the same reasons that make it so probative—proximity in time, place, and circumstances. The Dear shooting occurred only two days earlier and two blocks away and was accomplished by two shooters, acting in tandem to shoot simultaneously, on a public street. The ballistics evidence showing that the same gun was used in both shootings further established the value of Molette's statement as identity evidence.

¶ 91    Defendants also argue that the State presented little other evidence that the Dear shooting occurred. In addition to Molette's statement, the State presented a bullet from the other shooting. A trial court must guard against the admission of other-crimes evidence turning into a mini-trial of the other offense, and this consideration requires a careful balancing. *People v. Davis*, 2019 IL App (1st) 160408, ¶ 67 (when a court admits other-crimes evidence, "[t]he proceedings should not devolve into a minitrial on the uncharged offense"); *People v. Walston*,

- 14 -

386 Ill. App. 3d 598, 619 (2008) (admission of other-crimes evidence should not lead to a mini-trial of the other offense). We cannot say that the trial court abused its discretion in this regard, where the State introduced both the statement and corroborating ballistics evidence.

¶ 92    Thompson also argues that the statement was unfairly prejudicial because it gave his nickname as "Stay High." Defendant argues that this nickname "certainly did not paint him in a positive light," without offering any further explanation or argument on this point. See, *e.g.*, *People v. Chatman*, 2016 IL App (1st) 152395, ¶ 45 n.19 ("This court has repeatedly held that a party forfeits a point by failing to argue it."). Thus, we cannot find that this nickname resulted in undue prejudice or an abuse of discretion for admitting it.[3]

¶ 93    For the foregoing reasons, we cannot find that the trial court abused its discretion in admitting the other-crimes evidence of the Dear shooting. See *McNeal*, 2019 IL App (1st) 180015, ¶ 28 (the admission of evidence is subject to an abuse-of-discretion standard of review); *Ciborowski*, 2016 IL App (1st) 143352, ¶ 88 (same).

¶ 94                            IV. Proved to Be Signed

¶ 95    Thompson argues that he was denied a fair trial by the admission of Molette's statement as a prior inconsistent statement because the State failed to establish that Molette signed the statement.

¶ 96    Section 115-10.1 of the Code of Criminal Procedure of 1963 permits the introduction of a prior inconsistent statement, despite the bar against hearsay, if (1) the statement is inconsistent with a witness's testimony at trial, (2) the witness is subject to cross-examination concerning the statement, (3) the statement describes an event of which the witness had personal knowledge, and (4) the statement is proved to have been signed by the witness. 725 ILCS 5/115-10.1(a), (b), (c)(2)(A) (West 2016). The primary reason for the enactment of section 115-10.1 was to protect parties from "turncoat witnesses" who, while on the stand, disavow a prior statement by testifying differently or professing an inability to recall the statement or the underlying events. *People v. Lewis*, 2017 IL App (4th) 150124, ¶¶ 30-31.

¶ 97    Thompson argues that the trial court should have held a hearing, outside the presence of the jury, for the purpose of making a prior determination that the requirements of the above statutory section were satisfied. Thompson acknowledges in his reply brief that there is no binding or statutory authority requiring such a hearing. In support of his argument that a prior hearing should have been held, Thompson cites in support *People v. Brothers*, 2015 IL App (4th) 130644, ¶¶ 67-85, which discussed a different subsection than the one applied in the case at bar. See also *People v. Sykes*, 2012 IL App (4th) 100769, ¶ 43.

¶ 98    In both *Brothers*, 2015 IL App (4th) 130644, ¶ 70, and *Sykes*, 2012 IL App (4th) 100769, Justice Steigmann set forth a particular procedure that "should be followed," but only with respect to a particular subsection of section 115-10.1. In fact, Justice Steigmann carefully distinguished all the other subsections and explained why this procedure was needed only for the subsection that he discussed:

---

[3]Thompson further argues that his presentence report showed that he was not a gang member, whereas Davis's presentence report showed that he was. However, the information contained in the presentence reports was not admitted at trial or presented to the jury. As a result, it is not relevant to our consideration of this issue.

"If the prior statement cannot be presented to the jury in the form of (1) the witness's sworn testimony from an earlier proceeding [citation], (2) a statement written or signed by the witness [citation], or (3) an electronic recording [citation], then the proponent's only remaining option is to present the prior inconsistent statement to the jury by having the witness acknowledge, under oath, having made the prior statement [citation]." *Brothers*, 2015 IL App (4th) 130644, ¶ 69.

The problem, of course, was that, "if the witness does *not* acknowledge making the statement after being confronted with it," the jury has just heard a statement that is inadmissible as substantive evidence and that may, depending on its prejudicial effect, constitute reversible error. (Emphasis in original.) *Brothers*, 2015 IL App (4th) 130644, ¶ 72.

¶ 99 To avoid this problem, the *Brothers* court recommended that "the better practice is to conduct what we will refer to as the 'acknowledgment hearing' outside the presence of the jury." *Brothers*, 2015 IL App (4th) 130644, ¶ 74. However, the *Brothers* court explained that "the need to conduct acknowledgment hearings will usually arise only because police officers in the field have failed to preserve a witness's statements by *** obtaining a written or signed statement." *Brothers*, 2015 IL App (4th) 130644, ¶ 92. An acknowledgement hearing was, thus, not needed in the court's view in a case such as ours, where a written and signed statement was obtained.

¶ 100 In addition, we cannot find an abuse of discretion by the trial court for not, *sua sponte*, holding a hearing on this issue where, although Thompson's trial counsel objected to Molette's statement on other grounds, counsel did not object on the specific ground that the statement was inadmissible hearsay—an omission that Thompson acknowledges in his brief to this court. See *McNeal*, 2019 IL App (1st) 180015, ¶ 28 (the admission of evidence is subject to an abuse-of-discretion standard of review); *Ciborowski*, 2016 IL App (1st) 143352, ¶ 88 (same).

¶ 101 For the foregoing reasons, we do not find this claim persuasive and cannot find an abuse of discretion by the trial court on this ground.

¶ 102 V. Thompson's Sentence

¶ 103 Lastly, Thompson claims that his sentence was excessive.

¶ 104 The trial court has "broad discretionary powers" in sentencing a defendant. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). A trial court's sentencing decision receives substantial deference on review since "the trial judge, having observed the defendant and the proceedings, is in a much better position to consider factors such as the defendant's credibility, demeanor, moral character, mentality, environment, habits, and age." *People v. Snyder*, 2011 IL 111382, ¶ 36. In crafting a sentence, the trial court must balance "the seriousness of the offense" and "the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11; *People v. Wilson*, 2012 IL App (1st) 101038, ¶ 61. However, a defendant's rehabilitative potential is not entitled to greater weight than the seriousness of the offense. *People v. Reed*, 2018 IL App (1st) 160609, ¶ 62.

¶ 105 When a trial court imposes a sentence within the permitted statutory range, as occurred in the case at bar, a reviewing court will start with the presumption that it is proper. See *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46. Generally, a reviewing court will disturb a sentence "only if the trial court abused its discretion in the sentence it imposed." *People v. Jones*, 168 Ill. 2d 367, 373-74 (1995). A trial court abuses its discretion in sentencing when the sentence

- 16 -

is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." (Internal quotation marks omitted.) *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). Our supreme court has cautioned that a reviewing court "must not substitute its judgment for that of the trial court merely because it would have weighed the factors differently." *People v. Fern*, 189 Ill. 2d 48, 53-54 (1999).

¶ 106     In the case at bar, Thompson was sentenced to 59 years with IDOC, which was 41 years below the potential maximum sentence and only 7 years above the statutory minimum.

¶ 107     First, Thompson claims that his sentence is excessive because it should have been less than his codefendant's sentence because of Thompson's lesser criminal history.

¶ 108     Our supreme court has found that fundamental fairness requires that "similarly situated" codefendants, who were involved in the same crime, should not "receive grossly disparate sentences." *Fern*, 189 Ill. 2d at 58. In the case at bar, Thompson argues for a corollary of this principle, namely, that codefendants who were involved in the same crime, but who are *not* "similarly situated," should not receive the same sentence. *Cf. Fern*, 189 Ill. 2d at 58.

¶ 109     Illinois courts have found that an "improper sentence disparity" may occur when either (1) "equally culpable defendants with similar backgrounds are given substantially different sentences" or (2) "when equally culpable defendants with different backgrounds, ages, and criminal propensities are given the same sentence." *People v. Ramos*, 353 Ill. App. 3d 133, 139 (2004); *People v. Smith*, 214 Ill. App. 3d 327, 342 (1991). In the case at bar, Thompson claims the second situation occurred. With either claim of disparate sentencing, it is the defendant who bears the burden to "demonstrate that he and his codefendant were," or were not, "similarly situated with respect to background, prior criminal history, and potential for rehabilitation," depending on whether he asserts the first or second type of claim. See *Ramos*, 353 Ill. App. 3d at 139; *People v. Curry*, 296 Ill. App. 3d 559, 569 (1998).

¶ 110     In the case at bar, Thompson has not carried his burden because defendants' respective presentence reports show that the two codefendants were remarkably "similarly situated" with respect to age, background, criminal history, and potential for rehabilitation. See *Ramos*, 353 Ill. App. 3d at 139. Thompson was 21 years old at the time of the offense, while Davis was 22 years old. Both dropped out of high school: Thompson in the tenth grade, and Davis in the eleventh grade. At the time of the offense, both were unemployed, with Thompson being financially supported by his biological mother and Davis, by his foster mother.[4] Both reported substance abuse issues: Thompson reported problems with both alcohol and marijuana, while Davis reported using marijuana almost every day. Both denied any current gang membership, although Thompson conceded a prior gang affiliation. Both reported being diagnosed with psychological disorders: Thompson reported being diagnosed as bipolar, while Davis reported being diagnosed with a "mood disorder." Both had fathered multiple children and, when asked how they spent their leisure time, both stated that they enjoyed spending their free time with their children.

¶ 111     With respect to criminal history, Thompson had one reckless driving conviction and two convictions for drug possession. By contrast, Davis had eight convictions. However, almost all of Davis's convictions were also for driving and drug offenses. Besides the driving and drug

---

[4]Davis reported being physically and sexually abused as a child and being placed into foster care as a result, while Thompson reported that his mother provided "a good stable household." However, Thompson does not make any arguments on appeal based on this difference.

convictions, Davis had one conviction for battery. Thus, their criminal histories are not as different as Thompson argues.

¶ 112    Since Thompson has not satisfied his burden, he cannot succeed on his disparate sentencing claim.

¶ 113    Second, Thompson argues that Davis denied responsibility while Thompson did not. Although Thompson did not deny responsibility, he did not accept it either. In the presentence report, Thompson declined to comment on the facts of the offense, which was certainly his right; and, at sentencing, he stated only, "I want to thank my support system. Continue to be positive and I love them. That's it." Thus, consideration of this factor does not alter our finding.

¶ 114    In sum, we do not find Thompson's claim persuasive, or his sentence excessive, or that the trial court abused its discretion in sentencing him.

¶ 115                                    CONCLUSION

¶ 116    For the foregoing reasons, we are not persuaded by defendants' claims on appeal and affirm their convictions and sentences.

¶ 117    Affirmed.