2023 IL App (1st) 211359-U

No. 1-21-1359

Order filed June 21, 2023

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 7329 |
| | ) | |
| DEANDRE THOMPSON, | ) | Honorable |
| | ) | Thomas J. Byrne, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE D.B. WALKER delivered the judgment of the court.
Presiding Justice McBride and Justice Reyes concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The circuit court's summary dismissal of defendant's postconviction petition is reversed, and the case remanded for second stage proceedings, where defendant raised an arguable claim of ineffective assistance of trial counsel based on counsel's alleged failure to call a known alibi witness.

¶ 2    Defendant Deandre Thompson appeals from the circuit court's summary dismissal of his petition filed under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)). He contends that the court erred in summarily dismissing the petition because he presented an arguable claim that trial counsel was ineffective in failing to present an alibi witness who was

available and known to counsel. For the following reasons, we reverse and remand for second stage proceedings under the Act.

¶ 3        Following a 2017 joint jury trial, defendant and codefendant Cedryck Davis were convicted of the attempted murders of Shawn Harrington and his daughter, Naja Harrington.[1] Defendant was sentenced to a total of 59 years' imprisonment. Because our prior order affirming defendant's convictions on direct appeal sets forth the relevant facts at length (*People v. Thompson*, 2020 IL App (1st) 171265), we recount the facts here only as necessary to resolve the issue on this appeal.

¶ 4        Defendant's convictions arose from a shooting on January 30, 2014, at 7:45 a.m., as Harrington was driving Naja to school. Naja was not physically injured, but the shooting left Harrington permanently paralyzed. Defendant and Davis were each charged with attempted first degree murder of Harrington and Naja (720 ILCS 5/8-4(a); 9-1 (West 2014)) and aggravated battery of Harrington (720 ILCS 5/12-3.05(e)(1) (West 2014)). Prior to trial, the court granted the State's motion to admit other-crimes evidence that defendant and Davis shot Darren Dear two days before the Harrington shooting, and ballistic evidence established a bullet from the Dear shooting matched bullets recovered from the Harrington shooting.

¶ 5        At trial, Harrington testified that, on January 30, 2014, at 7:45 a.m., he was driving his normal route to drop off Naja, then 15 years old, at her school. As he stopped at a traffic light at Augusta Boulevard and Hamlin Avenue, he saw a man on the corner, 20 to 25 feet away, point in his direction. A gunshot then came through the back window. Harrington turned and observed a second man standing a short distance away from the first. Harrington pushed his daughter down

---

[1] Because these witnesses share a surname, we refer to the father as Harrington and his daughter as Naja.

in the front passenger seat to protect her. The shooting continued and Harrington heard at least 10 shots fired. He was hit and permanently paralyzed as a result. He identified Davis in a lineup at the police station on April 8, 2014. In court, Harrington identified Davis as the man who had pointed in his direction.

¶ 6    A video of the shooting was admitted into evidence and published to the jury; Harrington testified that he had viewed the video a week before trial and that it accurately depicted the shooting. He testified that the video showed his car proceeding south and, when it came to a stop, showed two people "come up the street" and shoot.

¶ 7    On cross-examination by defendant's counsel, Harrington testified that, before the shooting, he looked at the man he identified as Davis in an attempt to determine why he was pointing. After the first gunshot came through the back window, Harrington looked through the back passenger window and saw the second man standing to the side of Harrington's vehicle, less than half a car's length away. Later, the police showed Harrington photographs, but he was unable to identify the second man.

¶ 8    Naja, an 18-year-old college student at the time of trial, testified that, on January 30, 2014, at 7:45 a.m., her father was driving her to her high school. As his vehicle slowed for a traffic light, she saw two young black men on the sidewalk. One man wore a black vest and had gray sleeves, "[l]ike a hoodie under the vest," and stood near the intersection, 20 to 25 feet away from her; the other wore an orange hoodie and stood 15 feet from her position in the vehicle. Although their hoods were up, she saw their faces. She looked at each man for a few seconds and then straight ahead. She then heard bullets hitting the passenger door behind her and heard 10 to 15 shots in

total. Her father pulled her down and covered her with his body. Naja did not see a firearm in either man's hands.

¶ 9    On February 4, 2014, while her father was still in the hospital, Naja went to a police station to view a lineup and identified defendant as the man in the orange hoodie. On April 8, 2014, Naja, accompanied by her father, returned to the station, where, outside her father's presence, she viewed a lineup and identified Davis as the man in the black vest with gray sleeves. She identified defendant and Davis in court as the men she saw.

¶ 10    On cross-examination by defendant's counsel, Naja testified that she observed defendant for five seconds before the shooting and that his face was turned away from her for part of that time.

¶ 11    Assistant State's Attorney (ASA) Anthony Kenney testified that, on February 3, 2014, he interviewed Charles Molette regarding the shooting of Dear on January 28, 2014. Molette's statement, which Kenney memorialized by typing it on his laptop after speaking with Molette, was admitted into evidence and published to the jury. In the typed statement, Molette stated that he was 17 years old. On January 28, 2014, at 7:55 a.m., he saw a burgundy van stop near the intersection of Lawndale Avenue and Thomas Street. Molette identified defendant as the driver of a burgundy van and Davis as the passenger. He saw both defendant and Davis shoot at Dear on January 28, 2014, and provided details of the shooting. Molette signed each page of the statement.

¶ 12    Molette testified that he was in custody for a drug conviction. He denied having been in the area of the shooting of Dear on January 28, 2014, at 7:55 a.m. He further denied knowing Dear, being able to recognize defendant or Davis in court, or meeting with Kenney or Detective Hector Matias. He acknowledged that his name appeared at the bottom of each page of the typed

statement, but denied that the handwriting was his. He acknowledged that a photograph appended to the statement was of himself, but testified that he did not recall going to the police station.

¶ 13    Molette denied having told Kenney that, on January 28, 2014, he saw a burgundy van turn right on Thomas onto Lawndale, that he recognized Davis as the man in the passenger seat and saw him reach his right hand out of the van and fire at Dear, and that he recognized defendant as the driver and saw him run to the back of the van and shoot at Dear before reentering the van and driving off at a fast speed. He further denied having identified defendant and Davis in photographs.

¶ 14    On cross-examination by defendant's counsel, Molette identified himself in a photograph taken at a police station. He testified that, while he was at the station, "all these people tried to talk to" him and to get him to sign the statement, that he had refused, and that while at the station he denied knowing anything about a shooting.

¶ 15    Officer Steven Jaglarski testified that, on January 30, 2014, he encountered Molette, whom he knew, "on the street," and that Molette claimed to have information about the Harrington shooting and agreed to speak with detectives at the police station.

¶ 16    Matias testified that, at the police station on January 30, 2014, Molette told him that defendant and Davis committed the Dear shooting on January 28, 2014. Molette also gave information about the Harrington shooting.

¶ 17    On cross-examination by defendant's counsel, Matias testified that after a ballistics report identified a match between the bullets from the Harrington and Dear shootings, Molette returned to the police station on February 3, 2014, to give a statement. That same day, Matias issued investigative alerts for defendant and Davis.

¶ 18    Detective Mark Leavitt testified that, pursuant to investigative alerts issued after Molette gave his statement, defendant was arrested on February 4, 2014, and Davis on April 8, 2014. Leavitt was present when other officers recovered a video of the shooting from a nearby security camera. On cross-examination by defendant's counsel, Leavitt testified that the video depicted one shooter standing in front of the victim's vehicle and another shooter standing on the sidewalk near the side or rear of the vehicle.[2]

¶ 19    Witnesses testified regarding the recovery of firearms evidence from the scenes of the Dear and Harrington shootings. Officers recovered two fired bullets from Harrington's clothing; three fired bullets from the interior of his vehicle; and six .40 caliber shell casings, one .380 casing, and one .380 live round from the sidewalk at the scene. In the Dear shooting, a fired bullet was recovered from hospital medical personnel. A forensic scientist with the Illinois State Police testified that "the four fired bullets" from the Harrington shooting and the fired bullet from the Dear shooting were fired from the same firearm; that all six .40 caliber shell casings recovered in the Harrington case were fired from the same firearm; that a .380 caliber bullet and a .40 caliber bullet cannot be fired from the same firearm; and that, without a firearm to test, the fired bullets could not be compared with the shell casings.

¶ 20    The jury found defendant and Davis guilty of the attempted first degree murders of Harrington and Naja and found that defendant and Davis had each personally discharged a firearm during those offenses.

_____

[2] A DVD containing the video was submitted with the record on direct appeal, but could not be viewed (*Thompson*, 2020 IL App (1st) 171265, ¶ 8 n.2), and was not included in the record of the present appeal.

¶ 21    The trial court sentenced defendant and Davis to 59 years' imprisonment: 11 years and 8 years for the attempted murders of Harrington and Naja, respectively, with a 20-year sentencing enhancement on each count based on a finding that each defendant personally discharged a firearm.

¶ 22    On direct appeal, defendant argued that the evidence presented at trial was insufficient to prove his guilt beyond a reasonable doubt, that the trial court erred in admitting the other-crimes evidence, that the trial court erred in admitting Molette's written statement because it did not meet the requirements for a prior inconsistent statement, and that his sentence was excessive. *Thompson*, 2020 IL App (1st) 171265, ¶ 2. We affirmed and later denied defendant's petition for rehearing. *Id.* ¶ 116. The supreme court denied defendant's petition for leave to appeal. *People v. Thompson*, 154 N.E.3d 802 (Ill. 2020).

¶ 23    On June 30, 2021, defendant, through retained counsel, filed his petition under the Act. Defendant argued, *inter alia*, actual innocence premised on the affidavit of his grandmother, Carole Thompson,[3] and ineffective assistance of trial counsel for refusing or otherwise failing to call his grandmother to testify as an alibi witness.

¶ 24    In support of his petition, defendant submitted his own affidavit, stating that he was at his grandmother's house on the date of the shooting and that he was sick and did not leave her house at any time that morning. Before the trial, he told trial counsel that his grandmother was willing to testify and asked counsel to speak with her, but counsel said "it wasn't a good idea," "blew off" the request, and "did not use [defendant's] alibi."[4] Defendant averred he "was and am" willing to testify to his whereabouts on the morning of the shooting.

---

[3] Defendant's grandmother's name is also spelled "Carol" in the record.

[4] The petition as filed did not include defendant's notarized affidavit or verification, but these documents were subsequently filed on August 31, 2021.

¶ 25    Additionally, defendant included an affidavit dated June 17, 2021, from his grandmother.[5] She stated that she was defendant's grandmother and that they resided at her current address in January 2014. On January 30, 2014, she "was home on the morning *** as [defendant] was unwell and [she] wanted to take him to the hospital," and he "did not leave [her] home at any time" that morning. Carole Thompson "talked to the lawyer who represented [defendant] at trial and told him that [defendant] was home with [her] on the morning of January 30, 2014," and that she "was willing to testify to that fact." Counsel told her he "would call [her] back" but never did. She attended the trial and "told the lawyer [she] wanted to testify," but counsel told her to "just relax."

¶ 26    On September 16, 2021, the circuit court summarily dismissed the petition, finding all of its claims frivolous and patently without merit. Relevant here, in the written order, the circuit court stated that counsel was not ineffective in failing to call Carole Thompson as a trial witness, and that the decision reflected counsel's "overall defense trial strategy *** to rely on reasonable doubt" and "professional judgment not to advance an alibi defense." Defendant timely appealed.

¶ 27    The Act provides a three-stage method for a criminal defendant to collaterally attack a conviction by asserting, in a postconviction petition, that the conviction resulted from a "substantial denial" of a constitutional right. 725 ILCS 5/122-1(a)(1) (West 2020); *People v. Hodges*, 234 Ill. 2d 1, 9-10 (2009). The circuit court dismissed defendant's petition at the first stage. At the first stage, the circuit court must, within 90 days of the date a petition is filed, determine whether it "is frivolous or is patently without merit," and, if the court finds it so, must

---

[5] Carole Thompson's "Affidavit" includes a notary's seal and signature, but no language indicating its content was sworn. However, the State has not argued that the statement is deficient, and, at the first stage of proceedings under the Act, lack of notarization does not render a witness statement frivolous or patently without merit. See *People v. Allen*, 2015 IL 113135, ¶ 34; *People v. Coats*, 2021 IL App (1st) 181731, ¶ 30 ("appropriate" at first stage "to infer that [an affiant] would be willing to testify regarding the statements contained in her affidavit").

prepare a written order dismissing the petition and stating the reasons for the "summary dismissal." 725 ILCS 5/122-2.1(a)(2) (West 2020). In reviewing the petition at the summary dismissal stage, the circuit court may consider the court file, the transcripts, and any actions taken by an appellate court. 725 ILCS 5/122-2.1(c) (West 2020); *People v. Brown*, 236 Ill. 2d 175, 184 (2010).

¶ 28 Because most petitions at the first stage are drafted by *pro se* defendants with little legal knowledge, the threshold a petition must meet to survive summary dismissal is low, although the same standard applies even where the defendant is represented by counsel. *People v. Tate*, 2012 IL 112214, ¶¶ 9-12. All well-pleaded facts not positively rebutted by the original trial record must be taken as true, and the court cannot engage in factfinding or credibility determinations. *People v. Coleman*, 183 Ill. 2d 366, 385 (1998).

¶ 29 A petition need only "include a limited amount of detail and need not present formal legal arguments or citations to legal authority." *People v. Hatter*, 2021 IL 125981, ¶ 24. Summary dismissal is appropriate "only if the petition has no arguable basis either in law or in fact." *Hodges*, 234 Ill. 2d at 11-12, 16. Stated differently, the circuit court may not summarily dismiss a petition unless its claims are based on an indisputably meritless legal theory or the factual allegations on which the claims are based are clearly baseless, fantastic, or delusional. *Id.* at 13, 16-17. The allegations, when taken as true and liberally construed, need only present the "gist" of a constitutional claim in order for the petition to survive the summary dismissal stage and be advanced to second stage proceedings. *Id.* at 9, 11.

¶ 30 Our review of an order of summary dismissal is *de novo. Tate*, 2012 IL 112214, ¶ 10. We accept as true all of the petition's well-pled allegations that are not positively rebutted by the

record, and we make neither fact nor credibility determinations. *People v. Robinson*, 2020 IL 123849, ¶¶ 39, 45.

¶ 31     In this court, defendant contends the circuit court erred in summarily dismissing his petition as he raised an arguable claim that his trial counsel was ineffective in failing to present his grandmother as a witness. He also contends the court engaged in improper fact finding and credibility determinations exceeding the scope of first stage review.

¶ 32     The right of every defendant tried in an Illinois court to effective assistance of counsel is constitutionally guaranteed. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *People v. Carlisle*, 2019 IL App (1st) 162259, ¶ 73. To prevail on the claim, a defendant must meet the two-pronged test set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Albanese*, 104 Ill. 2d 504, 525-26 (1984) (adopting *Strickland* standard for challenges to effectiveness of both retained and appointed counsel under Illinois law). This test requires the defendant to show both that (1) counsel's performance was deficient, in that his or her representation fell below an objective standard of reasonableness, and (2) the defendant suffered prejudice as a result, *i.e.*, there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 525-26. At the first stage of postconviction proceedings under the Act, the standard is even lower: Summary dismissal is inappropriate where (1) counsel's performance *arguably* fell below an objective standard of reasonableness and (2) the defendant was *arguably* prejudiced as a result. *Hatter*, 2021 IL 125981, ¶ 25.

¶ 33     That said, in the context of a postconviction petition under the Act, issues that could have been raised on direct appeal, but were not, are generally forfeited. *People v. Holman*, 2017 IL

120655, ¶ 25. A finding of forfeiture may be an appropriate basis for summary dismissal. *People v. Blair*, 215 Ill. 2d 427, 445 (2005).

¶ 34 The State, in its brief, argues that defendant has forfeited various claims in the petition, including the claim that trial counsel was ineffective in failing to call his grandmother. With respect to that claim, the State argues that, because he neither raised the issue on direct appeal nor argued in his petition that appellate counsel was ineffective in having done so, the claim is forfeited. We disagree.

¶ 35 As the State acknowledges, a court will "relax" the rule of forfeiture not only where a petition claims that appellate counsel was ineffective in failing to raise an issue on direct appeal, but, alternatively, either where fundamental fairness requires or where "the facts relating to the issue do not appear on the face of the original appellate record." *People v. English*, 2013 IL 112890, ¶ 22 (citing *People v. Williams*, 209 Ill. 2d 227, 233 (2004)). In particular, an ineffective assistance claim that is " 'based on what ought to have been done may depend on proof of matters which could not have been included in the record precisely because of the allegedly deficient representation.' " *Tate*, 2012 IL 112214, ¶ 14 (quoting *People v. Erickson*, 161 Ill. 2d 82, 88 (1994)). Thus, the supreme court "has 'repeatedly noted that a default may not preclude an ineffective-assistance claim for what trial counsel allegedly ought to have done in presenting a defense.' " *Tate*, 2012 IL 112214, ¶ 14 (quoting *People v. West*, 187 Ill. 2d 418, 427 (1999)). Indeed, because the trial record is often " 'incomplete or inadequate' " for litigating ineffective assistance claims, postconviction proceedings may be preferable to direct appeal for this purpose. *People v. Bew*, 228 Ill. 2d 122, 134 (2008) (quoting *Massaro v. United States*, 538 U.S. 504-05 (2003)).

¶ 36    In the present case, defendant claims that trial counsel ought to have called his grandmother as a trial witness, and he appended to the petition her witness affidavit. This document does not appear on the face of the original appellate record. We therefore decline to find that defendant has forfeited his claim of ineffective assistance premised on counsel's failure to call Carole Thompson as a witness.

¶ 37    After reviewing the record, we find that defendant has met the standard that *Strickland* requires at the first stage of proceedings under the Act and therefore that the circuit court erred in summarily dismissing his petition. See *Hatter*, 2021 IL 125981, ¶ 25; *Coats*, 2021 IL App (1st) 181371, ¶ 28.

¶ 38    First, defendant's petition states an arguable claim that counsel's performance fell below an objective standard of reasonableness based on his failure to call Carole Thompson as a witness. The shooting occurred at 7:45 in the morning. In her statement appended to the petition, Carole Thompson stated that, on the date of the shooting, she "was home on the morning *** as [defendant] was unwell and [she] wanted to take him to the hospital," and he "did not leave [her] home at any time" that morning. She told trial counsel of this and of her willingness to testify, but counsel failed to follow up with her on the issue. She attended the trial and offered to testify, but counsel told her to "relax" and did not call her as a witness.

¶ 39    When considered with the trial evidence, Carole Thompson's statement appended to the petition, taken as true, indicates she would have provided an alibi to defendant, contradicting Molette's and Naja's identifications of him as one of the shooters. At the first stage, "the court may not engage in an assessment of the relative weight of the evidence supporting the defendant's conviction and the evidence which exonerates the defendant." *People v. White*, 2014 IL App (1st)

130007, ¶ 29. Given the record before us, counsel's performance arguably fell below a standard of reasonableness.

¶ 40     In so finding, we reject the State's argument, echoing the circuit court's conclusion, that counsel's decision not to call Carole Thompson as a witness "aligned with a trial strategy based on reasonable doubt rather than alibi."

¶ 41     It is well established that the selection of trial witnesses is a matter of defense strategy that is accorded deference and generally will not support a claim of ineffective assistance. *People v. Flores*, 128 Ill. 2d 66, 105-06 (1989). However, our supreme court has made it clear that consideration of trial strategy is inappropriate at the first stage of postconviction proceedings. *Tate*, 2012 IL 112214, ¶¶ 21-22. As the State acknowledges, in *Tate*, the supreme court recognized that trial counsel's alleged failures to call occurrence and alibi witnesses whose affidavits were appended to the defendant's petition "arguabl[y]" rendered counsel's performance deficient and resulted in prejudice. *Id.* ¶¶ 22-23. The supreme court rejected the State's argument that counsel had a "sound strategic reason" for the conduct alleged, deeming this "strategy argument" to be "inappropriate" for the first stage of review. *Id.* ¶¶ 21-22; see also *People v. Hayes*, 2022 IL App (1st) 190881-B, ¶¶ 28, 51 (reversing summary dismissal in reliance on *Tate*); *People v. Burns*, 2015 IL App (1st) 121928, ¶¶ 31-33 (same); *People v. Wilson*, 2013 IL App (1st) 112303, ¶¶ 19, 24 (same).

¶ 42     In this regard, the State's reliance on a trio of post-*Tate* appellate opinions which considered trial strategy in affirming summary dismissal of petitions based on claims of ineffective assistance of counsel is misplaced. See *People v. Brown*, 2017 IL App (1st) 150203, *People v. Knapp*, 2019 IL App (2d) 16016, and *People v. Shipp*, 2015 IL App (2d) 131309. We are bound

- 13 -

by our supreme court precedent, which holds that consideration of trial strategy is inappropriate at the first stage of postconviction proceedings at issue here. *Tate*, 2012 IL 112214, ¶¶ 21-22.

¶ 43    Turning to the second prong of the *Strickland* test, we reject the State's argument that defendant cannot show that he was arguably prejudiced as a result of counsel's decision not to call Carole Thompson as a trial witness because doing so "was unlikely to be successful." At the first stage of proceedings under the Act, "it need only be *arguable* that, had counsel performed adequately, *a significantly less than 50% chance* exists of a different outcome." (Emphasis added.) *Hayes*, 2022 IL App (1st) 190881-B, ¶ 39. A defense witness's statement that is exonerating and that contradicts a State's witness "can be capable of producing a different outcome on retrial." *People v. Adam*, 2013 IL App (1st) 111081, ¶ 36.

¶ 44    In this case, the State's primary evidence against defendant consisted of the testimony of one eyewitness, Naja, that she observed Davis and defendant just before the shooting, and of the prior inconsistent statement of a fact witness, Molette, that he saw defendant and Davis commit the Dear shooting shortly before the Harrington shooting. Naja observed defendant from 15 feet away for about 5 seconds, part of which time his face was turned away from her. The ballistics evidence indicated that a handgun used in the Dear shooting was also used in the Harrington shooting, and Molette's prior statement tied defendant and Davis to the Dear shooting. However, no physical evidence linking defendant to either shooting was introduced, and defendant did not make an incriminating statement. In light of the trial evidence, and given that we must take the allegations in the postconviction petition and affidavits as true and refrain from making credibility determinations, we find that, had Carole Thompson testified that defendant was with her at the time of the shooting, it is arguable that the result of the trial would have been different. Defendant,

therefore, meets the standard for a showing of prejudice at the first stage of postconviction proceedings with respect to his claim that counsel was ineffective in failing to call Carole Thompson.

¶ 45    Although the petition asserts additional claims, partial summary dismissals are not permitted under the Act. *People v. Cathey*, 2012 IL 111746, ¶ 34. Where a reviewing court considering a summary dismissal concludes that a petition sets forth an arguable claim of ineffective assistance of counsel with respect to one claimed error, "the entire petition must be remanded for further proceedings, regardless of the merits of any other claims." *Id.*

¶ 46    Accordingly, as we find the claim that defendant's trial counsel rendered ineffective assistance in refusing or otherwise failing to call Carole Thompson to testify is not frivolous or patently without merit, we reverse and remand for second stage proceedings. See *id.* In reaching this conclusion, we give no opinion on the ultimate merits of the assertions contained in the petition, or on whether defendant will ultimately prevail on any of his claims. See *Hodges*, 234 Ill. 2d at 22-23. Given that we reverse the decision of the circuit court, we need not address defendant's alternate claim that the circuit court engaged in improper fact finding.

¶ 47    For the foregoing reasons, we reverse the circuit court of Cook County's order summarily dismissing the petition, and we remand the case to the circuit court for second stage proceedings under the Act.

¶ 48    Reversed and remanded.