2025 IL App (1st) 232390-U

No. 1-23-2390

Order filed June 24, 2025

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 12926 |
| | ) | |
| CARL KRENTKOWSKI, | ) | Honorable |
| | ) | Patrick K. Coughlin, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE VAN TINE delivered the judgment of the court.
Justices McBride and Howse concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's convictions for first degree murder and attempted first-degree murder over his challenges to the sufficiency of the evidence and jury instructions regarding eyewitness identifications. We also affirm defendant's sentence over his contention that it is excessive.

¶ 2    A jury found defendant Carl Krentkowski guilty of first-degree murder and attempted first degree murder. The trial court sentenced him to 86 years in prison. On appeal, defendant contends that (1) the State failed to prove him guilty beyond a reasonable doubt because eyewitness

identifications of him were unreliable, (2) the trial court erred in not modifying the Illinois Pattern Jury Instruction regarding eyewitness identification testimony, and (3) his sentence is excessive. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      The State proceeded to trial on two counts of first degree murder (720 ILCS 5/9-1(a)(1) (West 2016)) premised on defendant shooting and killing Alex Saldana and two counts of attempted first degree murder (*id.* §§ 8-4(a), 9-1(a)(1)) premised on defendant shooting at Galindo Saldana and Alfredo Batrez.

¶ 5                                    A. Trial

¶ 6      The evidence established that Juana Saldana and her husband, who did not testify, lived on the 14600 block of Division Street in Posen, Illinois, in August 2017. Their four sons lived with them: Galindo Saldana, Jr., age 22, Jesus Saldana, age 20, Emmanuel Saldana, age 17, and Alex Saldana, age 14. All living Saldana brothers are now adults. We will refer to the Saldanas by their first names. For consistency, we will generally refer to other occurrence witnesses by their first names as well.

¶ 7                                1. The State's Case

¶ 8                                a. Emmanuel Saldana

¶ 9      Emmanuel Saldana testified that on August 2, 2017, he and a friend were walking near the intersection of West 150th Street and Maplewood Avenue in Harvey when a white GMC pulled up next to them. Nick DeMante (the parties and the record also refer to him as Nick Delmonte) was driving and defendant was in the passenger seat. Emmanuel knew defendant, whom he identified in court, "[f]rom around the area." Emmanuel referred to defendant by the nickname

"Car Car" and knew him to be a member of the Latin Kings gang. Nick said "they forgot to whoop [Emmanuel's] ass last time" and asked if he "was La Raza." Emmanuel responded that he did not "gang bang." Defendant and Nick exited the vehicle, beat Emmanuel, and took his wallet. Emmanuel returned home and told his family about the incident.

¶ 10    Two days later, on August 4, 2017, Emmanuel saw a video depicting the Saldanas' house that a Miguel Flores posted to Snapchat. Emmanuel found the video threatening and told his family about it. Emmanuel, his brothers, their cousin Alfredo Batrez, and Raul Gonzalez went to Miguel's house to "try to calm him down." Emmanuel, Jesus, and Raul went to the door and spoke to Miguel's sister. Emmanuel saw Miguel drive by in a gray pickup truck.

¶ 11    Emmanuel returned home and then went to the Posen police station with Jesus and their parents to report the August 2, 2017, incident. The police station was "[r]ight around the corner" from the Saldanas' house. While he was at the police station, Emmanuel heard gunshots, ran to his house, and saw Galindo holding Alex in the driveway. Alex left the scene in an ambulance.

¶ 12    At approximately 7:00 p.m. on August 5, 2017, Emmanuel identified defendant in a photo array as the person who attacked him on August 2. The State moved the photo array and an advisory form Emmanuel signed into evidence.

¶ 13                                b. Alfredo Batrez

¶ 14    Alfredo Batrez testified that the Saldana brothers are his cousins. At approximately 1 p.m. on August 4, 2017, Alfredo, Jesus, and Alex were walking near a beauty supply store when a white Chevrolet Tahoe stopped near them. Nick was driving and defendant, whom Alfredo identified in court, was in the front passenger seat. Alfredo knew defendant "from around town;" his nickname was "Car Car." Defendant made a hand sign indicating he was a member of the Latin Kings.

Alfredo testified that neither he nor his cousins were gang members. When defendant displayed the Latin Kings gang sing, Alfredo punched the Tahoe's rear windshield and the Tahoe dove away.

¶ 15    Later that day, Raul Gonzalez showed Alfredo a Snapchat video depicting the Saldanas' house, which Alfredo interpreted as a threat. Alfredo went to Miguel's house with the four Saldana brothers and Raul. Alfredo, Galindo, and Alex stayed in the vehicle while Jesus, Emmanuel, and Raul went to the door. The group then returned to the Saldanas' house. Alfredo saw a gold Silverado pickup truck circle the Saldanas' block approximately three times. Jesus and his parents went to the police station to report the truck and Emmanuel followed shortly thereafter.

¶ 16    Alfredo, Galindo, Alex, and Raul remained outside the Saldanas' house. At approximately 11 p.m., the Silverado approached from the north with its headlights on. Alex and Galindo were standing in the driveway. Alfredo went into the street near a white car and tried to throw a rock at the truck. When the truck neared Alfredo, it slowed down but did not stop. Alfredo saw Miguel driving, Nick "in the back," and defendant in the front passenger seat. Alfredo recognized defendant from earlier that day. Alfredo saw a firearm protruding from the passenger side window, which was three to four feet away. He saw "fire" and heard gunshots, so he "ran around" a Mustang parked at the south end of the driveway and back toward the sidewalk. Alfredo heard 9 or 10 gunshots total, after which the truck drove off. Alex was on the ground and said he had been shot; Galindo was holding him. Alex died on scene.

¶ 17    Alfredo identified photographs of the Saldanas' house as it appeared on the night of the shooting, which the State moved into evidence. The photographs depict two white cars parked in front of the house on either side of its driveway, one to the north and one to the south. When the pickup truck drove by, Alfredo was near the white Mustang parked just south of the Saldanas'

driveway, on the side of the vehicle closer to the middle of the street. Alfredo also identified a streetlight across from the Saldanas' house. The light hangs over the center of the street, illuminating the street in white light.

¶ 18    After the shooting, Alfredo went to the Posen police station and sat in a room with Galindo and Raul for "a couple of hours." Alfredo acknowledged that he told a detective that defendant used a Smith & Wesson firearm but testified he could not tell which model it was. At approximately 6:30 p.m. on August 5, 2017, Alfredo identified defendant in a photo array as the man who shot Alex. In court, Alfredo identified the photo array and an advisory form he signed, and the State moved them into evidence.

¶ 19                                  c. Galindo Saldana, Jr.

¶ 20    Galindo Saldana, Jr., testified that on the afternoon of August 4, 2017, he saw a threatening Snapchat video that Miguel posted. Galindo drove his three brothers and Alfredo to Miguel's house. Galindo and Alex remained in the vehicle while the others tried to talk to Miguel's parents. Galindo saw a brown pickup truck drive past and recognized it as Miguel's truck. The group returned to the Saldanas' house and saw the same brown pickup truck drive past twice. Jesus, Emmanuel, and their parents went to the police station to make a report about the truck.

¶ 21    Galindo, Alex, Alfredo, and Raul remained outside the Saldanas' house. Galindo stood in the driveway with Alex behind him. Galindo identified a photograph of his family's house as it appeared on the night of the shooting, which the State moved into evidence. Galindo indicated that he was standing where the driveway and the sidewalk intersected and Alex was behind him on the driveway. Alfredo was standing at the end of the driveway where it intersected with the street.

¶ 22    The brown truck drove down the street "pretty quick[ly]" and "slow[ed] down a little bit" as it approached the Saldanas' driveway. Galindo could not see the driver but "knew it was Miguel." Galindo saw Nick sitting in the rear seat. As the truck passed the Saldanas' driveway, Galindo saw that defendant, whom he identified in court, was in the front passenger seat. Galindo recognized defendant by his face tattoos and knew him by the nickname "Car Car." As the truck reached the driveway, Galindo saw defendant extend his right arm and begin shooting. Galindo looked at defendant for a second or two, then ducked down and heard "more than six" gunshots. The truck drove away.

¶ 23    Alex said he had been shot and was gasping for air. Galindo moved Alex next to a car but he "was gone already." Galindo called police and paramedics, who arrived shortly thereafter. Galindo went to the police station and learned that Alex had died. While at the station, Galindo sat in a room with Alfredo and Raul for several hours before he spoke with police. Defendant moved into evidence a photograph of the three men sitting together at the police station. On August 5, 2017, Galindo identified defendant as the shooter in a photo array. In court, Galindo identified the photo array and an advisory form he signed, and the State moved them into evidence.

¶ 24                                    d. Jesus Saldana

¶ 25    Jesus Saldana testified that he was walking home from a store with Alex and Alfredo at approximately 1 p.m. on August 4, 2017. A truck pulled up and Jesus saw that Nick was the driver and defendant, whom he identified in court, was the passenger. Jesus knew that defendant lived in Harvey and that his nickname was "Car Car." Defendant made a gang sign representing the Latin Kings. Jesus hit the truck's window and the truck drove away.

¶ 26    That evening, Raul showed Jesus a video that Jesus found concerning, so he told his mother and brothers about it. Jesus went to Miguel's house with his three brothers, Alfredo, and Raul. Jesus went to Miguel's door alone and briefly spoke with Miguel's sister. While he was at Miguel's front door, Jesus "heard a loud vehicle pass a few times, so [he] kind of guessed that was Miguel." Jesus returned home and his mother said that a vehicle passed by the house a few times. When the vehicle passed by again, Jesus and Emmanuel tried to chase it down. Jesus then went to the police station with his parents. Jesus told an officer about the truck and the incident earlier that day. While Jesus was speaking with the officer, he heard a radio call of shots fired at his home address, so he ran back home and saw Alex on the ground. An ambulance transported Alex to the hospital. When Jesus arrived at the hospital, he learned that Alex had died.

¶ 27    Jesus spoke to police at approximately 3:30 a.m. on August 5, 2017. He returned to the police station that evening and identified defendant in a photo array. In court, Jesus identified the photo array and an advisory form he signed, and the State moved them into evidence.

¶ 28                                e. Juana Saldana

¶ 29    Juana Saldana testified that her son Jesus told her about an incident that happened when he was going to the store on the afternoon of August 4, 2017. Later that evening, her sons left the house. While Juana and her husband were sitting in the living room, a truck drove by the house multiple times. Juana, her husband, and Jesus went to the police station to report the truck. At the station, a police officer asked Juana to call Emmanuel to ask him to come to the station, which he did. Shortly after Emmanuel arrived, the officer received a call on the radio, and everyone ran to the Saldanas' house. When Juana arrived, she saw Alex on the ground with police and paramedics nearby. At the hospital, Juana learned that Alex had died.

¶ 30                                    f. Police and Fire Witnesses

¶ 31    Posen police officer Christopher DeMato testified that he was dispatched to the 14600 block of Division Street for a call of a person shot at approximately 11:12 p.m. on August 4, 2017. When DeMato arrived, Alex was lying on the grass near the driveway and was unresponsive. DeMato stayed with Alex until paramedics arrived approximately two minutes later.

¶ 32    Posen police officer Dziekan testified that he met with Jesus, Emmanuel, and their parents at the Posen police station at approximately 11 p.m. on August 4, 2017. While they were talking, Dziekan received a call of shots fired on the 14600 block of Division Street and responded to it. When Dziekan arrived at the scene, he saw Alex lying on the ground with a gunshot wound to the chest and DeMato kneeling over him. Galindo told Dziekan that he knew who the shooter was and gave the name of "who owned that vehicle." Dziekan learned from police dispatch that a 1999 Chevrolet pickup truck belonged to Miguel.

¶ 33    Posen fire department lieutenant Mark Krizik testified that he responded to a call of a person shot on the 14600 block of Division Street at approximately 11:13 p.m. on August 4, 2017. He arrived approximately one minute later with paramedics and placed Alex into an ambulance. Alex had no pulse or blood pressure and was not breathing. The ambulance transported Alex to Christ Hospital's emergency room.

¶ 34    Posen police sergeant Ryan Grab testified that he interviewed Alfredo and Galindo at the police station on the morning of August 5, 2017. Alfredo and Galindo both stated that defendant was the shooter, Miguel was the driver, and Nick was the rear passenger. Grab then prepared three separate photo arrays for defendant, Nick, and Miguel. The photo array that included defendant

also included individuals who, like defendant, had face tattoos and beards. Neither Alfredo nor Galindo identified Miguel in the photo array that included his picture.

¶ 35    Grab was also present for a video recorded interview of Galindo by Assistant State's Attorney Eric Sauceda on August 6, 2017. During that interview, Galindo identified defendant as the shooter and stated that defendant had long hair and a beard on the night of the shooting. The picture of defendant in the photo array, which was taken less than two weeks before the shooting, showed defendant with short hair and a beard.

¶ 36    Grab also learned that Nick lived at Outreach Academy in Dixmoor, less than a mile from the Saldanas' home in Posen. Additionally, Grab testified that Emmanuel was arrested for possession of a firearm in 2019, unrelated to this case. Emmanuel "cooperate[d]" and was sentenced to probation in that case.

¶ 37    Riverdale police detective Lugo testified that he was a member of the South Suburban Major Crimes Task Force. On August 6, 2017, Lugo located a tan Chevrolet Silverado pickup truck registered to Miguel in Chicago Heights. He identified photographs of the truck, which were admitted into evidence.

¶ 38    Defendant, whom Lugo identified in court, was arrested on August 9, 2017, and detained at the Riverdale police station. Lugo and another detective gave defendant *Miranda* warnings and interviewed him at approximately 12:32 p.m. on August 9, 2017. In court, Lugo identified the *Miranda* warning form that defendant signed and the State moved it into evidence. Lugo also identified a partial video recording of defendant's interview and the State moved it into evidence. Defendant described himself as a "gang banger." He also described an incident in which he beat

two "Mexican kids" he did not know. Two days later, he saw the same "Mexican kids" at a phone store in Dixmoor, where they hit his truck.

¶ 39                                      g. Forensic Evidence

¶ 40    Illinois State Police lieutenant Sean Grosvenor testified that he was assigned to process the scene at approximately 12:45 a.m. on August 5, 2017. In court, Grosvenor identified photographs of the scene that he took, and the State moved them into evidence. The photographs depict the Saldanas' house on the east side of Division Street, with the driveway on the south side of the house and a streetlight directly across the street. The photographs also depict nine .40-caliber Smith & Wesson cartridge casings Grosvenor found on the street. Grosvenor testified that a semiautomatic weapon ejected these casings as it fired. The locations of the casings could not definitively establish where the weapon was fired because people, vehicles, wind, or the slope of the street could have moved the casings. Grosvenor recovered and inventoried the casings. He identified them in court and the State moved them into evidence.

¶ 41    Grosvenor also identified a scene diagram and a chart he prepared documenting measurements of the casings, which the State moved into evidence. These documents reflect that the casing closest to the Saldanas' house was 58.4 feet north of the house and the farthest was 227.1 feet north of the house, with the other seven casings in between.

¶ 42    The parties stipulated that Illinois State Police forensic scientist Jon Flaskamp was an expert in firearms and firearms identification. Flaskamp examined nine casings that Grosvenor recovered and concluded that all nine were discharged from the same weapon.

¶ 43    Dr. Xin Zhang was qualified as an expert in forensic pathology. She reviewed Alex's autopsy, which Dr. Eimad Zakariya performed on August 5, 2017. Alex died from a gunshot wound to the left side of his chest, and the manner of death was homicide.

¶ 44    The State rested.

¶ 45                              2. Defendant's Case

¶ 46                         a. Outreach Academy Stipulations

¶ 47    Defendant introduced the following stipulations.

¶ 48    Sharon Latiker worked at a temporary residential facility called Outreach Academy in Dixmoor, Illinois. A report documented that "Nicholas Delmonte" left Outreach Academy at 10:50 p.m. on August 4, 2017, and returned at 11:50 p.m. Another report documented that a Daniel Turner left Outreach Academy at 10:58 p.m. on August 4, 2017, and returned at 11:50 p.m.

¶ 49    Fred Wilkes was an information technology specialist at Outreach Academy. Outreach Academy's surveillance cameras were working between 10:20 p.m. on August 4, 2017, and 12:30 a.m. on August 5, 2017, but the date and time stamps on the videos were incorrect.

¶ 50    If recalled, Sergeant Grab would testify that he interacted with "Nicholas Delmonte" prior to Alex's murder and would identify him in the surveillance videos from Outreach Academy. Those videos showed "Nicholas Delmonte" leaving Outreach Academy at 10:58 p.m. and returning at 11:50 p.m. on August 4, 2017.

¶ 51    Blue Island police detective Sean Donica interacted with Daniel Turner prior to Alex's murder and would identify Turner in the surveillance videos from Outreach Academy. The videos showed Turner leaving Outreach Academy at 10:58 p.m. and returning at 11:50 p.m. on August 4, 2017.

¶ 52                                    b. Dr. Geoffrey Loftus

¶ 53    Dr. Geoffrey Loftus was qualified as an expert in the field of human perception and memory. Dr. Loftus expressed no opinion as to whether Alfredo or Galindo's identifications of defendant were reliable.

¶ 54    Dr. Loftus testified that memories consist of reliable sensory data combined with unreliable pre- and post-event information, which influences and fills gaps in the sensory data. Pre-event information includes a witness's expectations about what will happen. Post-event information includes a witness's inferences, such as assuming that the offender must have been a person with whom a witness had a prior confrontation. Post-event information also includes witnesses talking with each other, which can cause them to converge on a certain version of events. Therefore, witnesses' memories can be "very real seeming; very detailed" but "false in important ways" due to the influence of unreliable information. This can manifest as witnesses misidentifying the perpetrator of a crime.

¶ 55    Five factors affect a witness's ability to identify a person: expectations, lighting, stress, attention, and duration. Expectations cause a witness to remember an event as the witness expected it to happen. For example, a witness might misidentify a stranger as an acquaintance if the witness expected to see the acquaintance. A witness to a drive-by shooting would expect that the shooter was someone with whom the witness recently had a confrontation and could make a mistaken identification based on that expectation. In addition, if a witness expects the offender to be a certain person, then the witness has "no reason to pay further attention to the offender's appearance at all." However, Dr. Loftus acknowledged that it is easier for a witness to identify an acquaintance

than a stranger. In addition, an offender having "unique face tattoos" would allow the witness to narrow their identification to people the witness knew who had such face tattoos.

¶ 56    Lighting conditions also affect perception. The poorer the lighting, the less a witness can see. Viewing an event at night with only a streetlight "is severely suboptimal for being able to accurately perceive what is out there" because streetlights are "relatively dim" and widely spaced.

¶ 57    An intermediate level of stress can cause a person to be more alert, but an extremely high level of stress causes mental functioning to deteriorate. Although witnesses may have vivid and detailed memories of stressful events, those memories are often based on inaccurate post-event information.

¶ 58    Attention refers to focusing on sensory data that is relevant to the goal a person is trying to accomplish and filtering out sensory data that is irrelevant to that goal. This filtering process is "fairly unconscious and automatic" and focuses on danger. In a drive-by shooting, a witness would likely focus on keeping themselves and the people around them safe, calling for help, and potentially returning fire. Witnesses tend to focus their attention on weapons as opposed to who is holding the weapon. However, just because a weapon was involved in an incident does not mean that eyewitness identifications are unreliable.

¶ 59    Duration refers to the fact that the longer a witness pays attention to an event, the more sensory data the witness will gather about that event. "[F]unctional duration" refers to the "total portion *** of the whole crime that the witness is able to memorize what the offender looks like." Functional duration requires the offender to be in the witness's field of view, enough light and proximity to see the offender's face, and a degree of stress that allows the witness to form memories. Even if a drive-by shooting "takes a couple seconds, the functional duration available

to the witness to memorize what the offender looks like could be arbitrarily short. It could be as short as 0 [seconds]."

¶ 60    A witness identifying an offender whom the witness knew prior to the offense may not be reliable, particularly if the witness's opportunity to view the offender was poor. In that scenario, a "much more reasonable hypothesis *** is that [the witness's] identification was based on a match between their prior knowledge of what the offender looked like." Such an identification would be unreliable even if the witness expressed confidence about it. The witness's confidence would be based not on sensory data, but on unreliable post-event information falsely "confirming" the witness's expectations of who the offender would be.

¶ 61                            3. Jury Instructions and Verdict

¶ 62    During the jury instructions conference, the State proposed IPI Criminal No. 3.15, which stated:

> "When you weigh the identification testimony of a witness, you should consider all the facts and circumstances in evidence, including, but not limited to, the following:
>
> [1] The opportunity the witness had to view the offender at the time of the offense.
>
> [2] The witness's degree of attention at the time of the offense.
>
> [3] The witness's earlier description of the offender.
>
> [4] The level of certainty shown by the witness when confronting the defendant.
>
> [5] The length of time between the offense and the identification confrontation." Illinois Pattern Jury Instructions, Criminal, No. 3.15 (approved July 28, 2017) (hereinafter IPI Criminal No. 3.15).

¶ 63    Defendant proposed a modified version of IPI Criminal No. 3.15, which stated:

"When you weigh the identification testimony of a witness, you should consider all the facts and circumstances in evidence, including, but not limited to, the following:

1. The opportunity the witness had to view the offender at the time of the offense, including but not limited to:

a. the amount of time the witness had to observe the perpetrator;

b. the distance from which the witness observed the perpetrator; and

c. the lighting conditions at the time of the observation.

2. The witness's degree of attention at the time of the offense, including but not limited to:

a. whether the presence of a weapon distracted the witness's ability to view the perpetrator; and

b. whether stress impacted the memory of the witness.

3. The witness's earlier description of the offender.

4. The length of time between the offense and the identification confrontation.

5. Whether the witness was familiar with the person they identified from prior contact.

[Defendant voluntary omitted factors 6 and 7]

8. Whether the witness was exposed to opinions, descriptions, or identifications given by other witnesses, to photographs or newspaper accounts, or to any other information or influence, that may have affected the independence of his/her identification.

In evaluating this identification or any prior out-of-court identification by the witness, you should consider the observations and perceptions on which the identification

was based, the witness's ability to make those observations and perceive events, and the circumstances under which the identification was made. Such identifications, even if made in good faith, may be mistaken. Therefore, when analyzing such testimony, be advised that a witness's level of confidence, standing alone, may not be an indication of the reliability of the identification."

Defendant argued that Dr. Loftus's testimony supported the additional language in this instruction. Defendant drew these additional factors from New Jersey's jury instructions and *State v. Henderson*, 208 N.J. 208 (N.J. 2011). Defendant also cited *People v. Lerma*, 2016 IL 118496, for the proposition that expert testimony regarding the reliability of eyewitness identification is important because such identifications are "the cause of many wrongful convictions."

¶ 64 The State objected to defendant's proposed instruction. The State argued that IPI Criminal No. 3.15 was modified in July 2017, after *Lerma* and *Henderson*, and did not include the additional factors defendant proposed, which suggested that the instructions committee chose not to include those factors. The State maintained that defendant could argue factors such as distance, lighting, degree of attention, distraction, familiarity, and certainty, but those factors did not need to be added to IPI Criminal No. 3.15.

¶ 65 The court gave IPI Criminal No. 3.15 without modifications. The court explained that pursuant to Supreme Court Rule 451(a) (eff. April 8, 2013), it was required to use IPI Criminal No. 3.15 unless that IPI did not accurately state the law. The court reasoned that IPI Criminal No. 3.15 set forth the factors for evaluating eyewitness identifications outlined in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972), which our supreme court adopted as the applicable factors in *People v. Piatkowski*, 225 Ill. 2d 561, 567 (2007). The court also cited several appellate decisions holding

that IPI Criminal No. 3.15 correctly stated the law, including *People v. Polk*, 407 Ill. App. 3d 80, 109 (2010). The court concluded that IPI Criminal No. 3.15 correctly stated the law and there was no reason to modify it. Finally, the court found that defendant's proposed instruction was repetitive and improperly highlighted mistaken identifications.

¶ 66    The jury found defendant guilty on all counts.

¶ 67                                  B. Posttrial Motions

¶ 68    Defendant filed a motion for a new trial arguing in relevant part that the State failed to prove him guilty beyond a reasonable doubt and the trial court erred in giving IPI Criminal No. 3.15 without defendant's proposed modifications. He also filed a supplemental posttrial motion that argued (1) that "no physical or scientific evidence implicat[ed] defendant" and (2) Galindo's identification of defendant was unreliable because Galindo told police the shooter had long hair, but defendant had short hair. The supplemental motion also argued that Dr. Loftus's testimony supported giving defendant's proposed jury instruction on eyewitness identifications.

¶ 69    The trial court denied defendant's posttrial motions. The court rejected defendant's sufficiency of the evidence argument. The court explained that Alfredo and Galindo both testified that they saw defendant discharging a firearm toward the Saldanas' house and the jury was free to believe that testimony even considering Galindo's impeachment regarding the length of defendant's hair and Dr. Loftus's testimony about the reliability of eyewitness identifications. The court also reiterated that it refused defendant's proposed jury instruction on eyewitness identifications because IPI Criminal No. 3.15 accurately stated the law.

¶ 70                                  C. Sentencing

¶ 71    At the sentencing hearing, the trial court stated that it reviewed defendant's two presentence investigation reports (PSIs). The PSIs reflected that in 2011, defendant was convicted of burglary and aggravated unlawful use of a weapon in two separate cases and was sentenced to a total of four years in prison. In 2014, defendant was convicted of attempted armed robbery with a firearm and was sentenced to six years in prison. After his arrest in this case, in 2018, defendant was charged with aggravated battery of a peace officer, burglary, and criminal damage to property in two pending cases. In 2019, defendant was charged with possession of a weapon in a penal institution, which was also pending. In 2021, defendant was charged with public indecency; that case was pending as well. In 2023, defendant was charged with possessing a weapon in a penal institution in two separate cases, both of which were pending.

¶ 72    The PSIs also stated that when defendant was five years old, he witnessed his uncle's murder, and when defendant was eight, his father was arrested and imprisoned on drug charges. The Department of Children and Family Services removed defendant from his home at that time, and he was diagnosed with post-traumatic stress disorder, bipolar disorder, and attention deficit hyperactivity disorder. Defendant began "running the streets" at approximately age 10 and dropped out of school in the ninth grade. Defendant was affiliated with the Latin Kings from ages 11 to 27. At approximately age 20, defendant was diagnosed with anxiety and depression. Defendant worked for a brick laying company at the time of his arrest in this case. He was engaged and had a nine-year-old daughter with his fiancée.

¶ 73    In aggravation, the State submitted letters from Alex's parents, his sister-in-law, three of his aunts, and his cousin. These letters described the devastating effects Alex's death had on his

family. The State also highlighted that defendant admitted to being a member of the Latin Kings and was on parole when he committed this offense.

¶ 74    In mitigation, defendant submitted a letter from his fiancée, Luisa Avena, who claimed that defendant was "100% innocent and ha[d] been wrongfully accused," and that he "had been a law abiding citizen prior to this unfortunate incident." Avena gave examples of defendant helping family, friends, and neighbors as evidence of his good character. She also explained that defendant had a difficult upbringing but decided to leave "street life" and focus on his work and family.

¶ 75    In allocution, defendant insisted that he was asleep at home when Alex was murdered. Defendant claimed that Galindo lied about knowing him and that "the State manipulated the case against [him] and fabricated evidence." Defendant maintained that he was innocent but expressed condolences to Juana for the loss of her son.

¶ 76    The court stated that it considered all the statutory factors in aggravation and mitigation. As aggravating factors, the court highlighted defendant's multiple prior felony convictions, defendant being on parole at the time of Alex's murder, and the need to deter others from committing "senseless gang-motivated crime[s]." The court orally summarized the mitigating evidence in defendant's PSIs, including his uncle's murder and father's arrest, his mental health issues, and his struggles with substance abuse. The court merged the two first degree murder counts and sentenced defendant to 60 years in prison for first degree murder, plus 26 years on each of the attempted first degree murder counts. The sentences for attempted murder ran concurrently with each other but consecutively to the sentence for murder, for a total of 86 years in prison.

¶ 77    Defendant filed a motion to reconsider his sentences, which the trial court denied.

¶ 78    Defendant timely appealed.

¶ 79                                    II. ANALYSIS

¶ 80     On appeal, defendant challenges the sufficiency of the evidence supporting his convictions,

the trial court's decision to give IPI Criminal No. 3.15 without modifications, and his sentences.

¶ 81                          A. Sufficiency of the Evidence

¶ 82     Defendant first contends that the State failed to prove him guilty beyond a reasonable doubt

because Alfredo and Galindo's identifications of him were unreliable.

¶ 83     "When reviewing a challenge to the sufficiency of the evidence, we must determine

whether any rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt." *People v. Harvey*, 2024 IL 129357, ¶ 19. We review the evidence in the light

most favorable to the State and draw all reasonable inferences in the State's favor. *Id.*

¶ 84     As charged here, a defendant commits first degree murder when he "kills an individual

without lawful justification [and] in performing the acts which cause the death," the defendant

"either intends to do great bodily harm to that individual or another, or knows that such acts will

cause death to that individual or another." See 720 ILCS 5/9-1(a)(1) (West 2016). Both first degree

murder counts in this case also alleged that defendant personally discharged a firearm. A defendant

commits attempted first degree murder if he "does any act that constitutes a substantial step toward

the commission of" first degree murder. *Id.* § 8-4(a).

¶ 85     "A single, positive identification by someone who had ample opportunity to observe the

offender is sufficient to support a conviction." *People v. Conway*, 2023 IL 127670, ¶ 18. Illinois

courts evaluate eyewitness identification testimony using the *Biggers* factors, which are (1) the

opportunity of the witness to view the offender at the time of the offense, (2) the witness's degree

of attention, (3) the accuracy of the witness's description of the offender, (4) the witness's degree

of certainty in identifying the defendant, and (5) the length of time between the offense and the identification. *Piatkowski*, 225 Ill. 2d at 567. Courts also consider the totality of the circumstances because eyewitnesses often make identifications based on overall impressions rather than specific features. *People v. Middleton*, 2018 IL App (1st) 152040, ¶ 22.

¶ 86                                    1. Opportunity to View

¶ 87    A witness's ability to view the offender is the most important factor in the reliability analysis, but it is not dispositive. *People v. Johnson*, 2024 IL App (1st) 220494, ¶ 32. Variables such as distance, lighting, and length of time can affect the witness's opportunity to view the offender. *Id.* The question is "whether the witness was close enough to the accused for a sufficient period of time under conditions adequate for observation." (Internal quotation marks omitted.) *People v. Tomei*, 2013 IL App (1st) 112632, ¶ 40.

¶ 88    Alfredo and Galindo saw defendant in the truck's front passenger seat as the truck approached the Saldanas' driveway and just as defendant began shooting. Alfredo saw defendant from two to four feet away. Galindo saw defendant's face for one to two seconds. It was nighttime and dark outside, but photographic evidence established that a streetlight was directly over the area where Alfredo and Galindo saw the truck and illuminated the entire street with bright white light.

¶ 89    Importantly, both eyewitnesses knew defendant prior to this incident. Alfredo recognized defendant from seeing him earlier that day. Galindo knew defendant from school and recognized his face tattoos. The photo arrays show that defendant had a tattoo of the state of Illinois between his eyes and another tattoo under his left eye. Furthermore, both men knew defendant's nickname, "Car Car." Therefore, Alfredo and Galindo viewed and identified an acquaintance with a distinctive appearance, not a stranger. Dr. Loftus testified that witnesses can identify acquaintances

more easily and more quickly than strangers. Alfredo and Galindo's familiarity with defendant supports a finding that their identifications of him were reliable. See, *e.g.*, *People v. Williams*, 2015 IL App (1st) 131103, ¶ 74 (identification sufficient where eyewitness knew defendant's nickname and had met him "on multiple occasions" over the past two to three years); *People v. Sullivan*, 366 Ill. App. 3d 770, 783 (2006) (identification sufficient where eyewitness had seen the defendant "plenty of times" and identified him by his nickname on the night of the crime).

¶ 90    Defendant argues that Alfredo and Galindo's familiarity with defendant made their identifications of him less reliable, not more. Dr. Loftus testified that if a witness expects to see a certain person, the witness is more likely to believe they saw that person, even if they did not. Defendant implies that because Alfredo and Galindo knew defendant and had seen him recently, they incorrectly assumed he was the shooter. But that argument views the evidence in the light most favorable to defendant. As explained above, Dr. Loftus also testified that familiarity with a person makes it easier for a witness to identify that person quickly. Viewing the evidence in the light most favorable to the State, Alfredo and Galindo knowing defendant and interacting with him recently made it more likely that they could recognize him in the span of a few seconds. The jury could accept Dr. Loftus's testimony and still find Alfredo and Galindo's identifications reliable.

¶ 91    Defendant also contends that Alfredo and Galindo saw the shooter under poor lighting conditions for only a few seconds. It is true that Alfredo and Galindo's opportunity to see defendant was brief, but "[t]he brevity of a witness's opportunity to view, by itself, will not discredit an identification." See *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 45. The amount of time eyewitnesses saw the offender is just one factor that a factfinder can consider in weighing testimony. *Id.* We have found identifications sufficient when the eyewitnesses saw the defendant

for five seconds or fewer. *Id.* Counting seconds as "one one thousand, two one thousand" illustrates how a seemingly brief period can in fact be enough time to recognize someone's face. *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 30.

¶ 92 Defendant suggests that a backlighting effect from the streetlight would have obscured defendant's face in shadow. But viewing the evidence in the light most favorable to the State, as we must, the streetlight would have been shining down on top of the truck as it passed the Saldanas' house, illuminating defendant's head and face from the top, not the back. Accordingly, a rational jury could conclude that this *Biggers* factor weighed in favor of reliability.

¶ 93                                    2. Degree of Attention

¶ 94 The second *Biggers* factor concerns the degree of attention the eyewitnesses paid to the offender. *Piatkowski*, 225 Ill. 2d at 567.

¶ 95 On the night of the shooting, Alfredo and Galindo were wary of a truck circling the Saldanas' block. They had just seen that truck near Miguel's house when they tried to confront him about a threatening video he posted to Snapchat. Moreover, Alfredo had been involved in a confrontation with defendant that morning. These incidents were alarming enough that four Saldana family members went to the police station just before the shooting. This evidence supported an inference that Alfredo and Galindo's awareness was heightened when the truck approached the Saldanas' house. As Dr. Loftus explained, an intermediate degree of stress or nervousness can improve a witness's memory.

¶ 96 We acknowledge that defendant's use of a firearm and the stress of this event may have diminished the attention Alfredo and Galindo paid to defendant's face during the shooting. "[R]esearch on eyewitness identification shows that the presence of a weapon commands an

eyewitness's attention and diminishes the ability of the eyewitness to describe or recognize the offender, a phenomenon known as the weapon-focus effect." *Johnson*, 2024 IL App (1st) 220494, ¶ 33 (citing Jonathan M. Fawcett, Kristine A. Peace, & Andrea Greve, *Looking Down the Barrel of a Gun: What Do We Know About the Weapon Focus Effect?*, 5 J. of Applied Res. in Memory and Cognition, 257, 261 (2016)). It is reasonable to think that Alfredo and Galindo were not looking at defendant's face the entire time he was discharging a firearm toward them. In fact, both men testified that they ducked for cover after defendant opened fire. Nevertheless, a reasonable jury could find that Alfredo and Galindo paid attention to defendant's face in the moments leading up to when he opened fire, then ducked and lost sight of him. That scenario would permit reliable identifications of defendant.

¶ 97 3. Accuracy of Description

¶ 98 Evidence of the third *Biggers* factor was sparse. The video recording of Galindo's police interview reflects that he accurately described defendant's beard and forehead tattoo of Illinois. However, Galindo also claimed that defendant had long hair, which he did not. Nevertheless, the partial inaccuracy of one eyewitness's statement does not warrant reversing the jury's verdict because "[w]here the witness makes a positive identification, precise accuracy in the preliminary description is not necessary." See *Williams*, 2015 IL App (1st) 131103, ¶ 75.

¶ 99 4. Degree of Certainty

¶ 100 Recent cases have questioned the validity of this factor, but it remains part of the *Biggers* analysis. *Johnson*, 2024 IL App (1st) 220494, ¶ 53. At trial, Galindo expressed certainty that defendant was the shooter. Therefore, what little evidence exists on this factor weighs in favor of reliability.

¶ 101                                     5. Length of Time

¶ 102    The final *Biggers* factor examines the time between the offense and the identification. *Id.*

¶ 58. Alfredo and Galindo identified defendant in police interviews on the night of the shooting

and in photo arrays the following evening, less than 24 hours after the shooting. This factor weighs

in favor of reliability.

¶ 103    Defendant argues that the hours between the shooting and defendant's identification in the

photo arrays gave Alfredo and Galindo "the opportunity to confer with each other." Defendant

implies that Alfredo and Galindo encouraged each other to identify defendant as the shooter even

though that identification was mistaken or false. But there is no evidence that Alfredo and Galindo

had such discussions. This theory is defendant's speculation about what might have happened

when Alfredo and Galindo were together at the police station. At most, it is an inference drawn

from the timeline of Alfredo and Galindo's interactions with police. But we cannot draw inferences

in defendant's favor on appeal. See *Harvey*, 2024 IL 129357, ¶ 19.

¶ 104    Finally, defendant makes a somewhat underdeveloped argument that the photo arrays

suggested that Alfredo and Galindo should pick the man they recognized, defendant, over

strangers. Alfredo and Galindo identified defendant as the shooter *before* police prepared the photo

arrays, so police could not exclude defendant from the photo arrays just because Alfredo and

Galindo knew him. The point of the photo arrays was to determine whether Alfredo and Galindo

could identify defendant's face. They could and did.

¶ 105    We acknowledge that Alfredo and Galindo's testimony featured several inconsistencies

and contradictions. For example, Alfredo testified that the truck approached the Saldanas' house

from the north, traveling southbound. The Saldanas' house was on the east side of Division Street,

so if Alfredo was correct, then the truck's front passenger—the shooter—would have been on the far side of the truck. We do not understand how Alfredo and Galindo, who were on the east side of the street in front of the Saldanas' house, could have seen defendant brandishing a firearm from the truck's passenger-side window, which faced west. Also, Alfredo and Galindo testified that defendant began shooting when the truck was directly in front of the Saldanas' driveway, three to four feet from Alfredo. However, police recovered cartridge cases between 58 and 227 feet north of the Saldanas' driveway and none in front of the driveway. Alfredo and Galindo's accounts arguably do not match the physical evidence. Moreover, Alfredo and Galindo claimed they saw Nick in the truck's rear passenger seat, but the truck police recovered did not have a rear passenger seat. However, the jury was responsible for resolving conflicts in the evidence. *People v. Epstein*, 2022 IL 127824, ¶ 21. We cannot usurp the jury's role. *People v. Weeks*, 2011 IL App (1st) 100395, ¶ 27. The jury was free to accept Alfredo and Galindo's identification of defendant even though their accounts may not have been entirely accurate or consistent. See *Middleton*, 2018 IL App (1st) 152040, ¶ 26.

¶ 106 The evidence in this case was not overwhelming, but when we view it in the light most favorable to the State, we conclude that a rational jury could find that defendant was the shooter. See *id.* ¶ 23. Accordingly, we affirm defendant's convictions over his challenge to the sufficiency of the evidence.

¶ 107                                      B. IPI Criminal No. 3.15

¶ 108 Defendant next argues that the trial court erred by giving IPI Criminal No. 3.15 without his proposed modifications.

¶ 109   Jury instructions convey the law that applies to the evidence before the jury. *People v. Ortiz*, 2017 IL App (1st) 142559, ¶ 50. If an applicable IPI exists, the trial court must use it unless the court finds that the IPI does not accurately state the law. *Id.* (citing *People v. Pollock*, 202 Ill. 2d 189, 211-12 (2009)); Ill. S. Ct. R. 451(a) (eff. Apr. 8, 2013). If appropriate, a non-IPI instruction must be accurate, simple, brief, impartial, and free from argument. *Ortiz*, 2017 IL App (1st) 142559, ¶ 50. The instructions as a whole must not be misleading or confusing. *Id.* We review a trial court's decision on which jury instructions to give for an abuse of discretion. *Id.* "An abuse of discretion in the refusal of a non-IPI occurs only where there is no IPI instruction applicable to the subject on which the jury should have been instructed and the jury was, therefore, left to deliberate without proper instructions." *Id.* (citing *People v. Garcia*, 165 Ill. 2d 409, 432-34 (1995)).

¶ 110   A trial court should give IPI Criminal No. 3.15 "when identification is an issue," as it was in this case. See IPI Criminal No. 3.15. Illinois courts have consistently held that the five *Biggers* factors listed in IPI Criminal No. 3.15 "are an accurate statement of the law 'for assessing the reliability of identification testimony.' " *Polk*, 407 Ill. App. 3d at 109 (quoting *Piatkowski*, 225 Ill. 2d at 567); see also *Middleton*, 2018 IL App (1st) 152040, ¶ 22. Because IPI Criminal No. 3.15 accurately stated the law, the trial court was required to use it. See *People v. Bannister*, 232 Ill. 2d 52, 81 (2008); Ill. S. Ct. R. 451(a) (eff. Apr. 8, 2013). The trial court's decision to give IPI Criminal No. 3.15 without modifications was not an abuse of discretion.

¶ 111   *Ortiz* guides our reasoning. In *Ortiz*, the defendant proposed the following non-pattern instruction:

"Although nothing may appear more convincing than a witness's categorical identification of a perpetrator, you must critically analyze such testimony. Such identifications, even if made in good faith, may be mistaken. Therefore, when analyzing such testimony, be advised that a witness's level of confidence, standing alone, may not be an indication of the reliability of the identification." *Ortiz*, 2017 IL App (1st) 142559, ¶ 47.

The last two sentences are identical to the instruction defendant proposed in this case. And like in *Ortiz*, defendant argued that IPI Criminal No. 3.15 was outdated and contrary to the scientific evidence concerning the reliability of eyewitness testimony. See *id.* The *Ortiz* court rejected that argument and affirmed the trial court's decision not to give the defendant's non-IPI language. *Id.* ¶ 51. We reach the same conclusion.

¶ 112    Defendant cites *Lerma* for the proposition that IPI Criminal No. 3.15 does not accurately state the current law or science of eyewitness identifications. In *Lerma*, our supreme court held that the trial court should have allowed the defendant to call an expert witness, Dr. Loftus, to testify regarding the unreliability of eyewitness identifications. *Lerma*, 2016 IL 118496, ¶ 25. The court explained that defendants should be able to challenge eyewitness identifications using scientific evidence because recent research showed that eyewitness identifications are often unreliable. *Id.* ¶ 24. The court "recognize[d] that such research is well settled, well supported, and in appropriate cases a perfectly proper subject for expert testimony." *Id.* We agree, and that is why it was appropriate for defendant to call Dr. Loftus in this case.

¶ 113    However, *Lerma* did not hold that IPI Criminal No. 3.15 misstates the law, nor did it replace *Biggers* as the standard of eyewitness identification reliability in Illinois. In fact, *Lerma* did not discuss jury instructions at all. Furthermore, IPI Criminal No. 3.15 was amended in July 2017,

approximately a year and half after the supreme court decided *Lerma*, and the committee did not change the five *Biggers* factors listed in the instruction. On the contrary, the committee notes state that IPI Criminal No. 3.15 "lists factors well-established by case law." IPI Criminal No. 3.15.

¶ 114 Defendant also argues that Dr. Loftus's testimony supported modifying IPI Criminal No. 3.15. We disagree. The jury heard Dr. Loftus's testimony regarding the factors that influence eyewitnesses' memory and identifications. Defendant was free to argue how those factors applied to this case and the jury was free to consider those arguments. There was no need to give Dr. Loftus's opinion testimony the force of law by incorporating it into a jury instruction.

¶ 115 Defendant claims that Dr. Loftus "analy[zed] the strength of [Alfredo and Galindo's] identifications" and found them to be unreliable. That is inaccurate. On direct examination, defendant asked Dr. Loftus to analyze a "hypothetical" drive-by shooting with facts similar to this case as a roundabout way of suggesting that Alfredo and Galindo's identifications were unreliable. But on cross-examination, Dr. Loftus confirmed that he "ha[d] no opinion as to whether the eye witness identification[s] in this case [were] accurate or inaccurate."

¶ 116 Also inaccurate is defendant's claim that his "proposed amendments to the IPI instruction follow well established Illinois case law." None of the cases defendant cites in support of this claim approved such modifications to IPI Criminal No. 3.15. See, *e.g.*, *People v. Allen*, 376 Ill. App. 3d 511, 516-27 (2007); *People v. Tisdel*, 338 Ill. App. 3d 465, 468 (2003). Accordingly, we affirm the trial court's use of IPI Criminal No. 3.15.

¶ 117                                    C. Sentence

¶ 118    Finally, defendant contends that his *de facto* life sentence is excessive because the trial court did not consider his rehabilitative potential or mitigating factors such as his difficult childhood.

¶ 119    A trial court has broad discretion in sentencing a defendant and we will not overturn its sentencing decision unless the trial court abuses its discretion. *People v. Colone*, 2024 IL App (1st) 230520, ¶ 134. The trial court must consider all applicable factors in aggravation and mitigation, but we will not reverse its decision just because we would have weighed those factors differently. *Id.* ¶¶ 134-135.

¶ 120    In this case, the sentencing range for first degree murder was 20 to 60 years (see 730 ILCS 5/5-4.5-20(a) (West 2016)) plus a 25-year enhancement for personally discharging a firearm (see *id.* § 5-8-1(a)(1)(d)(iii)). Therefore, defendant's sentencing range for first degree murder was 45 to 85 years. Defendant's 60-year sentence is in the middle of this range. The sentencing range for attempted first degree murder was 6 to 30 years as a Class X felony (see *id.* § 5-4.5-25(a); 720 ILCS 5/8-4(c)(1) (West 2016)) plus a 20-year enhancement for personally discharging a firearm (see 720 ILCS 5/8-4(c)(1)(C) (West 2016)). Therefore, defendant's sentencing range for attempted first degree murder was 26 to 50 years. Defendant received the minimum sentence, 26 years, on both counts of attempted first degree murder. Because all of defendant's sentences are within the statutory ranges, they are not excessive unless they greatly vary from the spirit and purpose of the law or are manifestly disproportionate to the offenses. *Colone*, 2024 IL App (1st) 230520, ¶ 135.

¶ 121    The most important factor in sentencing is the seriousness of the offense. *People v. Hussain*, 2024 IL App (1st) 230471, ¶ 44. In this case, the seriousness of the offense cannot be overstated. Defendant shot and killed an unarmed 14-year-old boy for no apparent reason while he

was standing in his own driveway. Alex's murder alone would support a sentence of up to 85 years. See 730 ILCS 5/5-4.5-20(a), 5-8-1(a)(1)(d)(iii) (West 2016).

¶ 122   Although defendant did not kill Galindo or Alfredo, the attempted murder offenses were serious as well. The truck in which defendant was a passenger circled the Saldanas' block before the shooting, suggesting that defendant was targeting the Saldanas and waiting for an opportunity to open fire. In addition, defendant fired multiple times toward a group of people. That is an inherently dangerous act that suggests callous indifference to who is injured or killed. Defendant's sentences do not vary from the spirit and purpose of the law or disproportionate to the offenses. See *Colone*, 2024 IL App (1st) 230520, ¶ 135.

¶ 123   Defendant suggests that his troubled childhood lessens his culpability for this offense. Specifically, defendant contends that he became involved in gang violence not "because he was evil or irreparably depraved" but "because this was what he had been exposed to at a young age." The trial court was aware of the family tragedies defendant experienced at a young age, such as his uncle's murder and his father's incarceration. The court discussed those factors in its ruling. The record establishes that the trial court considered the mitigating factors defendant presented. We will not reweigh those factors. See *id.* ¶¶ 134-135.

¶ 124   Defendant also contends that "the record does reflect his rehabilitative potential," pointing to "his efforts to remove himself from the Latin Kings." We disagree. The record indicates that defendant is more likely to reoffend than rehabilitate. Defendant was convicted of four violent felonies between 2011 and 2014. His four-year prison sentence in the 2011 cases did not deter him from committing further violent crimes in 2014, and his six-year prison sentence in that case did not deter him from murdering Alex in 2017, when defendant was still on parole. Defendant was,

by his own admission, a gang member at the time of Alex Saldana's murder. Even after his arrest in this case, defendant allegedly committed offenses while in jail in 2018, 2019, 2021, and 2023. The record shows that defendant commits violent offenses regardless of whether he has been to prison before, is on parole, or is currently in custody. None of defendant's sentences to this point have deterred him from engaging in violent behavior as soon as he was out of custody, so we are unpersuaded that defendant should receive yet another chance at release and rehabilitation.

¶ 125   Finally, defendant complains that the trial court did not acknowledge it was imposing a *de facto* life sentence. Defendant cites no authority holding that a trial court failing to acknowledge that it is imposing a *de facto* life sentence warrants resentencing. Accordingly, we affirm defendant's sentences.

¶ 126                                   III. CONCLUSION

¶ 127   For the foregoing reasons, we affirm defendant's convictions and sentences.

¶ 128   Affirmed.